## Mills v. Commonwealth.

(Decided October 6, 1931.)

360

J. B. CAMPBELL, TUGGLE & TUGGLE and R. L. POPE for appellant.

J. W. CAMMACK, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Appellant, Marshall Mills, seeks a reversal of a judgment convicting him of murder and fixing his punishment at life imprisonment.

The homicide occurred at about 11 o'clock a. m. on September 15, 1930. The deceased, Jess Baker, lived at the mouth of Laurel Branch, and was operating a moonshine still on the Buckeye branch of Big Stinking Creek. Appellant and his 17-year-old son, Edward Mills, lived on Tom's branch of Big Stinking about a half mile from the mouth of the branch. The principal witness introduced by the commonwealth was Oliver Baker, the ten-year-old son of the deceased, who testified in substance as follows: He and his father, Jess Baker, left home about 12 o'clock at night, went to the residence of Bill Mills, put their mule in the stable, and stayed the rest of the night. They ate breakfast there, and then went on to the still. It was daylight when they got to the still. Bill Mills accompanied them to the still. After they got to the still, Bill Mills "went and got the works." They built a fire and went to work. His father was engaged in changing fruit jars, and he helped his father in the work. Once he went and got some dry wood, right above the still. After a while his father lay down and went to sleep. He was sitting just above his father's head. Guns fired and killed his father. He never saw anybody shoot. He then ran, and other shots were fired. Bill Mills had been gone about three hours before the killing took place. After the first shot, he heard a whole lot more. He could hear the bullets over his head. While there, he never saw his father with any pistol. His father had on a watch while he was there at the still.

Ada Baker, the wife of the deceased, testified that she saw her husband on Sunday night about 11 or 12 o'clock. He was going to Buckeye, and their little boy, Oliver Baker, went with him. He said "he was going to help Marshall Mills make liquor that day." Her husband and Marshall Mills had been making liquor for about a year. She saw appellant Saturday before the killing.

Appellant said that he wanted to see Jess; that Jess had done him dirty, took off seven gallons of liquor, had not paid him, and had not come back as he said he would. When her husband left, he had $42. He also owned a watch. After he was killed, he did not have the watch or the money. The evidence further discloses that several persons went to the scene of the homicide, but that the body of the deceased was not moved until the officers arrived. The officers found Baker lying on his back with a shotgun wound in the top and side of his head, and also a large wound in his hip. He had a watch chain, but no watch, and only 40 cents in money. A pistol from which two shots had been fired was found lying between his arm and his side. This pistol appellant bought from John G. Baker.

Appellant's evidence in brief is as follows: About 9 o'clock on the morning of the homicide he and his son Edward Mills went to a cornfield on the land of his brother, Bill Mills, for the purpose of looking after some fodder. "The squirrels were cutting on the hickory nut trees," and he took the shotgun along with him to try to get a squirrel. He did not know that Jess Baker was over in that country, and did not expect to see him. He did not aim to kill Jess Baker that morning, or at any other time, and had never attempted to hurt him in any way. After looking at the fodder, they started back. They intended to go back through Bill's place and tell him they would take the fodder. As they went along, and were about 50 or 70 yards above the still, they saw the smoke. As they approached, they saw Jess Baker sitting there. Jess commenced cursing, and he asked Jess what was the matter. Jess whirled around, went behind a bush, and fired on him. He went to his knees, and Jess fired another shot. He then fired his shotgun. One of the shots fired by Jess went through his overall pocket. The gun he used was a 12-gauge breech-loading shotgun, and could only put in one cartridge at a time. After firing the shot, he got up. When he looked up, Edward was gone, having left while the shooting was going on. After the shooting he went to the home of his brother Jim and told him what had taken place. He then went to Shingle Roof, and from there to Bell county. There he sent a boy to phone for Bev Walker, the sheriff's husband. When Jess Baker fired the first shot at him, Oliver was about 50 yards up above the still getting some brushwood or something, and was not sitting beside

his father. He fired his shotgun because he believed he was in danger, and shot as quickly as he could. He never had any interest in the still, and never had any conversation with Mrs. Baker about her husband's having done him dirty in regard to the liquor. Appellant's testimony was corroborated by that of his son Edward, who says Baker first fired two shots and his Daddy fired one shot, and then he ran. He was standing behind his Daddy at the time and the first shot went by him. Other witnesses, who were some 400 yards or more away, and claimed to have heard the pistol shots, say that the first two shots sounded like pistol shots and the last one like a shotgun.

Bill Mills testified that Jess Baker and Oliver never came to his house about midnight. They came there the next morning. Jess put the mule in his stable and was going on down Middle Fork to try to sell some hogs. Two or three witnesses claim to have met appellant immediately after the homicide, and to have seen a hole in the pocket of his overalls. Appellant and other witnesses testified that on Sunday evening previous to the difficulty appellant traded the pistol found at the side of the deceased to deceased for a sewing machine, which was then at the home of appellant's mother. The latter testified that she had not purchased the machine, but had contracted for it.

One of the grounds urged for reversal is that the evidence is too vague and uncertain to support the verdict. On one hand we have the testimony of Ada Baker that appellant stated to her that Jess had done him dirty, had taken off seven gallons of liquor, and had not paid him, and had not come back as he said he would; the evidence of Oliver Baker that his father was asleep when shot, and that his father had no pistol and fired no shots, coupled with the finding at the side of the deceased of the pistol which was shown to have belonged to appellant. On the other hand, we have the threats of the deceased, the evidence of appellant and his son that the deceased first fired at appellant, the evidence of certain witnesses that the first shots fired sounded like pistol shots, and that the last shot fired sounded like it came from a shotgun, together with evidence to the effect that on a previous Sunday appellant had traded the pistol to the deceased for a sewing machine. Clearly, there is nothing vague or uncertain about the evidence. On each side it is direct and positive. Therefore the case turns on the credibility of the witnesses, a question for the

jury, and it cannot be said that its finding is flagrantly against the evidence.

The court did not err in permitting Ada Baker, the wife of the deceased, to testify to appellant's statement that deceased had done him dirty, had taken off seven gallons of liquor, and had not paid him for it, etc. The statement of appellant was an admission showing hostility toward the deceased, and was admissible for the purpose of proving a motive for the crime.

Mrs. Baker's evidence that, when her husband left home on the night prior to the homicide, he said "that he was going to help Marshall Mills make liquor that day" should not have been admitted. The statement was made in the absence of appellant, was pure hearsay, and does not fall within any of the exceptions to the hearsay rule.

After testifying to what her husband said, Mrs. Baker was permitted over the objection of appellant to testify as follows:

"Q. Do you know how long that your husband and Marshall Mills had been working together? A. No, sir, I don't remember.

"Q. Well, do you know in the neighborhood of about how long, Mrs. Baker? A. Well, I guess it was a year.

"Q. And that making liquor? A. Yes, sir."

Of course Mrs. Baker was a competent witness if she knew that her husband and appellant were working together in the making of whisky, but the last question was so leading and prejudicial that the court should not have permitted her to answer until the question was properly framed.

The self-defense instruction contained the following qualifications: "Provided, however, that if you believe from the evidence in this case, beyond a reasonable doubt that the defendant, Marshall Mills, either voluntarily engaged in a shooting difficulty with the deceased, Jess Baker, or if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant sought and brought on the shooting affray with the deceased by he, or his son Edward Mills, going to the still where the deceased was killed for the purpose of doing violence to or shooting the deceased, and that the deceased was killed under these circumstances, by the defendant, then the defendant cannot be acquitted on the grounds of self-defense and apparent necessity therefor." The rule is

that the accused cannot be acquitted on the ground of self-defense if he and the deceased voluntarily engaged in a mutual combat with the intention of killing each other. The language of the proviso is "that the defendant Marshall Mills either engaged in a shooting difficulty with the deceased Jess Baker." It does not embrace the necessary elements of the mutual combat rule, or submit the theory of mutual combat to the jury. On the contrary, it makes no mention of any participation by the deceased, but takes away the right of self-defense, if appellant voluntarily engaged in the difficulty, and that, too, though appellant's conduct may have been wholly justifiable. We are therefore constrained to hold that that part of the proviso attempting to submit the issue of mutual combat was erroneous and prejudicial to the substantial rights of appellant. The latter part of the proviso is also subject to the criticism that it does not embrace the idea that the acts therein referred to were done by appellant at a time when he did not believe, or have reasonable grounds to believe, that he was then and there in danger of death or some great bodily harm at the hands of the deceased, or other equivalent words.

Complaint is made of the fact that during the argument the circuit judge vacated the bench and a local attorney presided in his absence. The Constitution guarantees to the citizen the right of trial by jury, and the circuit court is the only tribunal in which such trial can take place. To constitute the court there must be a judge possessed of certain constitutional qualifications, and we are therefore committed to the rule that he should be present at every stage of the proceedings in order that he may properly conduct the trial and protect the rights of both the state and the accused. Wheeler v. Commonwealth, 120 Ky. 697, 87 S. W. 1106, 27 Ky. Law Rep. 1090. However, it sometimes happens that the trial judge, on account of fatigue, bad health, or other cause, is compelled to vacate the bench during the argument. When necessity arises, it is the common practice for the judge to select a local attorney to take his seat rather than delay the trial. Only in rare instances does anything occur affecting adversely the rights of the parties. In view of this custom, we are not disposed to reverse a judgment of conviction because the trial judge vacated the bench in the absence of an objection by the accused, or a showing that his substantial rights were prejudiced —a situation not here presented.

A further ground of complaint is that the judge allowed each side only 30 minutes for argument. Under our Constitution, the accused in all criminal prosecutions has the right to be heard by himself and counsel, Constitution, Sec. 11, and this right, of course, necessarily includes a reasonable time for argument. What is a reasonable time depends upon the facts and circumstances of each particular case, and is a matter in the sound discretion of the trial judge. Therefore, unless it affirmatively appears that this discretion has been abused to the prejudice of the accused, it will not amount to reversible error. Combs v. Commonwealth, 97 Ky. 24, 29 S. W. 734, 16 Ky. Law Rep. 699; Thomas v. Commonwealth, 175 Ky. 38, 193 S. W. 653. In the light of the facts of that case it was held in Lucas v. Commonwealth, 149 Ky. 495, 149 S. W. 861, 42 L. R. A. (N. S.) 209, a homicide case, that there was no abuse of discretion in limiting the argument to 30 minutes a side. As this case must be reversed on other grounds, it becomes unnecessary to determine whether the limitation placed on the argument was an abuse of discretion. Although it is often true that short arguments are better than long ones, yet, in view of the fact that many attorneys require more time than others, we think it is the better practice in homicide cases where the death penalty may be inflicted, or the accused may be given life imprisonment, for the judge to allow more than 30 minutes on the side for the argument of the case.

For the reasons given, the judgment is reversed, and cause remanded for a new trial consistent with this opinion.