# Gambrel v. Commonwealth.

(Decided November 10, 1931.)

TUGGLE & TUGGLE for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

Opinion of the Court by Creal, Commissioner— Reversing.

Gord Gambrel, Tom Gambrel, Merkle Gambrel, Allen Gambrel, and Jim Messer were jointly indicted in the Knox circuit court for the murder of A. Y. Messer. In a second count it was charged that Gord Gambrel committed the murder and the other defendants aided and abetted him in the crime. In a third count it was charged that all the defendants entered into a conspiracy to murder A. Y. Messer, and that, in pursuance to said conspiracy and while it existed, they did murder him. On separate trials, Gord Gambrel, Tom Gambrel, and Merkle Gambrel were found guilty. The punishment of Merkle Gambrel was fixed at life imprisonment, and the punishment of Tom and Gord Gambrel was fixed at ten years' imprisonment.

The homicide occurred about 2 p. m. on Sunday, June 15, at the home of Jim Messer on the Lost Fork branch of Stinking creek in Knox county. The Jim Messer at whose home the tragedy occurred and Jim Messer, the defendant, are different persons, and, in order to avoid confusion and to distinguish between them in a discussion of the case, we shall call the latter defendant Jim.

So far as the record discloses, Jim Messer had three sons, Earl, Allen, and A. Y. Messer. Earl resided with his father. A. Y. Messer married Sudie Gambrel, and they lived on a branch of Lost Fork about a mile above the home of his father. Allen Messer was married and lived on the same branch a short distance below the home of his brother A. Y. Messer. Gord Gambrel lived on another branch of Lost Fork about one-half to three-quarters of a mile above the home of Jim Messer. Defendants Tom Gambrel, Merkle Gambrel, and Allen Gambrel are his sons; the former being married and living a short distance below the home of his father. The other two lived with their father. Defendant Jim Messer was making his home with Gord Gambrel at the time of the homicide.

Some time prior to June 15, the wife of Tom Gambrel caused a warrant to be issued, authorizing a search of the homes of A. Y. and Allen Messer, which warrant was placed in the hands of a constable by the name of Allen Messer. To avoid confusion arising out of the identity of names, we shall refer to him as Constable

Messer. The officer deputized one Jim Patterson to assist him in making the search. They arrived at the home of Gord Gambrel on Saturday afternoon and remained there that night. On Sunday morning, they went to the homes of Allen and A. Y. Messer, accompanied by Mrs. Tom Gambrel, Allen Gambrel, and Rosie Messer. In making the trip to the homes of the Messer boys, they followed a road down the right-hand branch on which the Gambrels lived, passed by the home of Jim Messer at the forks of the creek, and then up the other branch. After searching Allen Messer's home, they proceeded to the home of A. Y. Messer. The evidence discloses that A. Y. Messer told the officers that they might proceed with the search, but there is some conflict in evidence as to what was said by him. The evidence, however, indicates that he was not in the best of humor. Mrs. Gambrel and others in the party testified that he made threats against the Gambrels and that he ran Allen Gambrel away from his home and followed him some 75 or 100 yards. Allen Gambrel proceeded across the mountain to the home of his father and a little later was followed by the officers and others who accompanied them. Constable Messer or some of the party told Gord Gambrel what had occurred at A. Y. Messer's.

Twenty-five or thirty minutes before the killing occurred, Merkel Gambrel, Allen Gambrel, and defendant Jim Messer left the home of Gord Gambrel and went down the road towards the home of Jim Messer. They testified that they were going to a store on the main branch of the creek and that the regularly traveled route to the store led by the home of Messer. They admitted that Merkle Gambrel and defendant Jim Messer were armed with pistols. They all testified that Allen Gambrel was not armed. Tom Spurlock, who married a daughter of Gord Gambrel and who testified that he spent Saturday night and Sunday with his father-in-law, stated that he saw defendant Jim Messer and Allen and Merkel Gambrel start down the road, and that about twenty-five minutes thereafter Tom Gambrel and Gord Gambrel left, going in the same direction. The former carried a high-powered rifle and the latter a shotgun; that about twenty minutes later he heard about thirty-five shots fired in rapid succession which seemed to be near the forks of the branch; that after a short time he heard twenty or twenty-five more shots up near the home of Gord Gambrel. He stated that shortly after the last shooting Jim Messer,

Tom Merkle, and Allen Gambrel returned to the house and after "so long a time" Gord Gambrel came back; that Merkle Gambrel had been shot and it appeared that the wound had been inflicted with a shotgun.

Sudie Messer testified as to ill feeling between her father and her deceased husband. She stated that about four years before the homicide, A. Y. Messer reprimanded her father for courting his own daughter, and the latter stated that he would see her husband later, if he lived.

Mrs. Mary Miller, who with her husband was spending the day with the Gambrels, testified that a short time before the shooting she heard Tom Gambrel's wife say to him, "I would not go, you will get killed or have to kill some of them." Thereupon Tom took three high-powered cartridges in his hand and said, "That's what will do the work."

Earl Messer and his mother, Mrs. Jim Messer, were introduced as witnesses by the commonwealth; Jim Messer having died previous to the trial. These witnesses stated that Allen Messer was insane or that his mind was so impaired as to prevent his testifying. Their evidence shows that about 2 o'clock Jim Messer went out in his yard to untie a mule that was hitched to a post, leaving his wife and their three sons in the house. Shortly after he left the house, a number of shots were fired, and they all ran out into the yard. Defendant Jim Messer and Allen Gambrel were in the road about thirty feet from the house. They were armed with pistols. Gord Gambrel was near the barn and Tom Gambrel by a fence a short distance away. They were both armed with long guns. All of the defendants were firing toward the Messers and toward the house. A. Y. Messer ran back into the house, procured a shotgun, and fired two shots at the defendants, after which he was shot and killed. Mrs. Messer, who ran to her son after he fell in the yard, received a number of gunshot wounds. One shot, evidently a ball from a pistol or rifle, struck her foot, tearing off two toes. Small shot, evidently a charge from a shotgun, struck her legs; she testified that there was also a gunshot wound in her arm. Earl Messer testified that he saw no arms in his crowd other than the shotgun which was fired by his brother. Mrs. Messer testified that she saw Allen fire one shot with the pistol.

All of the defendants and a number of other witnesses who were at the home of Gord Gambrel on the day

of the tragedy testified that Allen and Merkle Gambrel and defendant Jim Messer started to the store to purchase some tobacco and coffee. After they left and before the shooting, Mary Miller and her husband and another woman left Gambrel's and started across the mountain to their home. They heard the shots a short time after they left. Gord Gambrel and his son, Tom, and others who remained at his home, testified that he and Tom Gambrel did not go down to the home of Jim Messer, but, after hearing the shooting, they started down in that direction and met Merkle and Allen Gambrel and defendant Jim Messer returning home. All of the defendants testified positively that Tom Gambrel and Gord Gambrel were not down at the home of Jim Messer and took no part in the shooting.

Allen and Merkle Gambrel testified, in substance and effect, that when in about thirty yards of Jim Messer's home they saw him on the porch and heard him say, "Shoot 'em boys." That Allen Messer came off from behind the smokehouse and got behind an apple tree and A. Y. Messer and Earl Messer came from behind the kitchen. Allen had a long gun, A. Y. had a shotgun, and Earl had a pistol; that all of them opened fire on the three defendants present. Allen Gambrel testified that he then saw the defendant Jim Messer and Merkle Gambrel jerk out their pistols; that he ran and did not see either one of them fire. Merkle Gambrel testified that both he and defendant Jim Messer returned the fire of the Messers.

Tom Gambrel denied that he exhibited the cartridges at the home of his father or that he made the statement attributed to him by the witness Mary Miller. In this he was corroborated by other witnesses. Gord Gambrel denied that he had the conversation or words with A. Y. Messer about four years before the homicide as testified by Sudie Messer or that he had used any threatening language to or toward him.

It is first urged by appellant's counsel that the court erred in admitting the evidence of Sudie Gambrel as to a threat made by Gord Gambrel against deceased four years before the homicide, because of the remoteness of the threat from the time of killing. However, this witness testified that the ill feeling engendered by the conversation between her father and husband continued down to the time of the killing. Threats indicating a purpose or

intention to do harm to another are admissible in evidence to show that such a purpose and intention existed.

As a further ground for reversal, it is urged by counsel that the court erred in permitting detailed evidence as to the wounds received by Mrs. Jim Messer at the time her son was killed and in permitting her wounds and her shoes and clothing to be exhibited to the jury. Ordinarily, it is improper to admit evidence of offenses other than that on which accused is being tried, but there are well-recognized exceptions to that rule, and the evidence as to the wounds received by Mrs. Messer clearly comes within those exceptions. The shooting of Mrs. Messer was so connected with the shooting of her son that separation was impossible. Aside from the general rule and exceptions thereto, evidence as to the nature of Mrs. Messer's wounds and the wounds themselves, if they are as described in the evidence, support the theory of the commonwealth that both Gord Gambrel and Tom Gambrel were present and armed with a shotgun and a high-powered rifle, respectively, and were acting in concert with the other defendants. The evidence for the commonwealth indicated that Gord Gambrel was present and that he left his home with a shotgun. The defendants who admit that they were present testified that they only had pistols. Mrs. Messer, according to the evidence, was shot with a shotgun. The loss of two toes from one of her feet might also indicate that the wound was inflicted by a ball larger and more powerful than one coming from a .32 or .38 pistol, thus supporting the theory of the commonwealth that Tom Gambrel was present and shooting at the Messers with his high-powered rifle.

Counsel makes further complaint that the court did not permit Dr. Salyers to testify as to the gunshot wound received by Merkle Gambrel. The court did not err in the particular, because Merkle Gambrel and other witnesses testified that he had been shot with a shotgun and this was not denied. In fact, the commonwealth introduced evidence to show that A. Y. Messer did shoot at the defendant with a shotgun, and so a detailed statement or description of his wounds could serve no good purpose.

As additional grounds urged for reversal of the lower court's judgment, it is insisted by counsel that the court erred in instructions to the jury. The first objection is directed at the instruction on conspiracy; it being

asserted that there is not sufficient evidence to warrant a conspiracy instruction, and further, if such instruction had been warranted by the evidence, the one given is fatally defective in form.

There is evidence to show such a state of feeling existed betwen deceased and Gord Gambrel that neither he nor his wife had visited the home of her father for more than three years, although living in the same community. The bad feeling was fanned into flame when Mrs. Stella Gambrel caused the Messers' home to be searched and when Messer ran Allen Gambrel away from his home. Within a few hours after these happenings, according to the evidence for the commonwealth, Gord Gambrel and his three sons and defendant Jim Messer who resided in the Gambrel home were seen going toward the home of Jim Messer and all of them were armed. A little later, they were all acting in concert in shooting at members of the Messer family. Just a short time before starting out with his high-powered rifle, Tom Gambrel showed three cartridges and made the statement that they will do the work. These facts and other circumstances in the case make it at once apparent that the court properly gave a conspiracy instruction even though there was a sharp conflict in the evidence as to the matters detailed. The insistence that the conspiracy instruction is not sufficient in form because it does not require that the homicide should have been committed in the execution of such a conspiracy is wholly without merit, as the instruction in question embodies this language, "and that in pursuance of said conspiracy and while same existed and in furtherance thereof." The case of Gambrell v. Commonwealth, 130 Ky. 513, 113 S. W. 476, cited by counsel for appellant, is sufficient authority for holding that the instruction was warranted, and it is sufficient in form and substance.

The objection leveled at instruction No. 4, on the ground that the aiding, abetting, etc., should be with "malice aforethought," is likewise without merit, as those very words are properly used in the instruction.

The last objection relating to the instructions is directed at the qualifications of the self-defense instruction. The self-defense instruction contains the following proviso and qualification:

"Provided, however; you cannot find the defendant not guilty on the ground of self-defense

or apparent necessity therefor or defense of another or apparent necessity therefor if you believe from the evidence of this case, beyond a reasonable doubt, that he either conspired to kill and bring about the death of A. Y. Messer and that under said conspiracy the deceased Messer was killed or voluntarily engaged in the difficulty in which A. Y. Messer was shot and killed by going to the home of Jim Messer where A. Y. Messer was and began shooting at him first.''

The instruction is fatally defective, in that it does not properly submit to the jury the theory of mutual combat. In the recent case of Mills v. Commonwealth, 240 Ky. 359, 42 S. W. (2d) 505, decided October 6, 1931, this court had for consideration this identical question, and held a similar instruction to be prejudicial to the accused. In the course of the opinion, it was said:

''The rule is that the accused cannot be acquitted on the ground of self-defense if he and the deceased voluntarily engaged in a mutual combat with the intention of killing each other. The language of the proviso is 'that the defendant . . . engaged in a shooting difficulty with the deceased. . . .' It does not embrace the necessary elements of the mutual combat rule, or submit the theory of mutual combat to the jury. On the contrary, it makes no mention of any participation by the deceased, but takes away the right of self-defense, if appellant voluntarily engaged in the difficulty, and that, too, through appellant's conduct may have been wholly justifiable. . . . The latter part of proviso is also subject to the criticism that it does not embrace the idea that the acts therein referred to were done by appellant at a time when he did not believe, or have reasonable grounds to believe, that he was then and there in danger of death or some great bodily harm at the hands of the deceased, or other equivalent words.''

On another trial of this case, the case of Gambrel v. Commonwealth, supra, should be used as a guide in framing that part of the qualifications of the self-defense instruction relating to conspiracy.

Judgment reversed, and cause remanded for a new trial in conformity with this opinion.