## Webb v. Commonwealth.

(Decided Jan. 29, 1935.)

ROY W. HOUSE and WILLIAM LEWIS & SON for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS and H. HAMILTON RICE, Assistant Attorneys General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

On a change of venue from Clay county, Walter Webb and Squire Reed have been tried in the Laurel circuit court on a joint indictment charging them with the murder of Estil Spurlock. The trial resulted in an acquittal of Reed, but in a verdict and judgment finding Webb guilty and fixing his punishment at imprisonment for life.

In seeking a reversal of the judgment, it is argued by his counsel (1) that the court erred in the admission and rejection of evidence (2) that the verdict is prejudicial and flagrantly against the weight of evidence; and (3) that the instructions given by the court were erroneous and prejudicial.

The homicide occurred at the voting place in South Fork precinct in Clay county on the day of the regular primary election held in August, 1933. The voting booths were in a building several feet from the highway with a wire fence along the front of the lot on which the building stood. There was a long porch in front of the building, the roof of which was supported by columns or posts. It appears from the evidence that at 4 o'clock in the afternoon a large number of persons who had not voted congregated on the porch, and there was considerable confusion and disorder. One Bowling, a justice of the peace, summoned Estil

Spurlock and three others to assist in quelling the disorder and clearing the congestion on the porch so prospective voters or others might get to the door of the room where the election was being conducted. At the time, appellant, Reed, and others were standing in the road, and some one suggested that under the law the polls might be kept open thirty minutes longer in order to permit voters who had assembled to cast their vote. Up to this point there is little dispute concerning the facts, but there is a sharp and irreconcilable conflict in proof offered by the respective parties as to subsequent events.

According to the evidence of witnesses for the commonwealth, Estil Spurlock, in response to the summons of the magistrate, walked up to the door of the voting room and requested those assembled there to stand back so voters could get to the voting booths, and, while so doing, Squire Reed came upon the porch, caught him by the shoulder, and, according to some of the witnesses, said, "God damn you, who are you?" Spurlock turned, pushed him away, saying, "Who are you?" About this time, appellant left the road and climbed over the fence onto the porch between Reed and Spurlock, saying to Reed, "Do and say what you damn please, I am with you." Some time during the affray Reed drew a pistol, and, when appellant came up on the porch, he also had a pistol in his hand. Practically all the large number of witnesses for the commonwealth who were present testified that deceased backed off the porch and down to a point near the fence followed by appellant; that deceased was unarmed and some of the witnesses stated that he had his hands up and others would say he had his hands "this way," the record not indicating the position referred to by the witnesses; that appellant had a pistol drawn on deceased and immediately before the shots were fired deceased attempted to grab the pistol. Immediately following the shots, he fell, rolled under the fence to the ditch, and was dead when others got to him.

The evidence of Reed, which was fully corroborated by a number of witnesses for the defense, was to the effect that Reed went to the door of the voting place to inform the election officers that they had a right to keep the polls open for thirty minutes to permit voters assembled there to cast their votes; that, when he went up and took hold of the screen door, deceased

said, ''There is not a damn thing to you,'' and began striking him in the face, and, when appellant appeared on the scene, deceased quit his assault on Reed and caught appellant; that they fought and struggled off the porch and down to the point where the shots were fired. Appellant, in explanation of how he happened to have his pistol in his hand, stated that, when he took hold of a post and pulled himself up onto the porch, the pistol fell out of his pocket, and he caught it with his right hand. He testified that deceased turned, grappled him, and they scuffled down the porch onto the ground, where he broke away with his pistol in his hand, and deceased followed, grabbing for the pistol and did finally make a lunge and grab it; that he was backed into the fence where he caught his foot in the wire; that Lige Spurlock, who was approaching with an open knife, picked up a rock and·threw it at him, but that it struck Estil Spurlock. In· detailing what followed, the witness said:

''That made Estil much madder, I believe he thought it was me. He had me so I could not get away. Uncle Lige came up with the knife. I had to shoot Estil to keep Uncle Lige from killing me.''

Appellant was likewise corroborated in most of the material details of his evidence by a number of witnesses introduced by the defense.

On behalf of appellant it is shown that while at work at the Kroger Grocery Company he sustained a severe injury to his head, and that as a result thereof or from some other cause not disclosed became mentally deranged, and was confined for a time to a sanitarium or rest home in Ohio where mental or nervous diseases are treated, and was later taken to the Ohio State Hospital. As we understand the record, he left the hospital to come to Kentucky to stand trial. Frank Sharp, who took appellant to the rest home, stated that he had known him all his life and that in the last year had noticed a change in his mental condition; that when taking him to the rest home he seemed abnormal in his talk and actions, had false ideas and hallucinations; that he wanted to be president of Kroger Grocery Company and felt from the services he had rendered that he would attain this position. Dr. George T. Harding, one of the physicians in the rest home, which is now called the Harding Sanitarium, testified that

appellant was placed under his care and observation when brought there. He detailed at length statements made by the patient indicating illusions and imaginative self-importance. He also testified as to blood tests and other tests made. He stated that, because of the abnormal behavior and conduct of appellant which was constantly present at all hours of the day and night during the entire period of observation, he diagnosed his trouble as schizophrenia or dementia præcox of the paranoid type, which he explained in common language meant a type of mental sickness in which there is a breaking down of the personality and an imbalance of reason, a mental enfeeblement and deterioration always accompanied by organic or structural breaking down of the brain; that it is a degenerative disease almost always continuously progressive, and the rate of recovery is very low; that it is considered a practically hopeless condition; that in his opinion the patient would be insane on any date since that time; that the patient's condition was such that he could not control his impulses; that insanity of his type was a dangerous kind with homicidal tendencies. Dr. Fred H. Weber, a specialist in the treatment of mental disease and who had been connected with the rest home, testified that he had heard the statements of Dr. Harding with respect to the mental and physical condition of Walter Webb, and that from his personal observations of the patient and diagnosis he concurred in Dr. Harding's statement.

In rebuttal, some lay witnesses who had known and associated with appellant were introduced by the commonwealth and gave as their opinion from the conversation and actions that he was mentally normal. Local physicians were also introduced by the commonwealth and asked what the result of tests made by the Ohio physicians as testified to by them would indicate. These physicians did not attempt to qualify as experts in mental diseases or to give an opinion concerning the condition of mind of appellant; they did, however, state in effect that the conditions disclosed by the tests made by the physicians would indicate that the patient was normal.

One of the matters mentioned by counsel in arguing the first ground urged for reversal relates to a question propounded to appellant concerning his pistol falling out of his pocket and into his hand when he got

on the porch. The claim that this question was pre-judicial is wholly without merit, because appellant had indicated on direct examination that his pistol accidentally swung out of his pocket and that he caught it as it fell. Appellant was asked on cross-examination if he was crazy, and it is argued that this was prejudicial, but, in view of his apparent plea of insanity and the evidence introduced by him to sustain such plea, the fallacy of this contention is self-evident.

On cross-examination of Frank Sharp as to statements made by appellant and his observations of his acts and conduct after he claimed to have noted a change in his condition, he was asked if upon these occasions or other times appellant was drinking or drunk and was asked concerning his habits in that respect. Evidently the purpose of this line of examination was to ascertain or show whether, at the times referred to by the witness, appellant's talk or conduct was the result of intoxicants rather than mental disease. It was a proper subject of inquiry, but, in any event, was not calculated to sway or prejudice the minds of the jury, and especially is this true where, as in this instance, the witness answered in the negative.

An attack was also made on the competency of evidence of local physicians and laymen offered in rebuttal concerning the mental condition of appellant. The lay witnesses testified that they had known and associated with appellant, and their evidence only related to matters that would appear to an ordinary layman from such association and acquaintance. Such of the evidence of the physicians as may not have been competent was clearly not prejudicial.

A number of witnesses were called by the defense to testify to the good reputation of Squire Reed for peace, quietude, etc., and it is vigorously urged that the questions propounded to these witnesses on cross-examination were highly prejudicial to appellant. Some of these witnesses stated that Reed was a good peaceable man, etc., and were asked in effect if he was not a man of considerable means and political influence. Evidently the purpose of this line of interrogation was to show that the bankers and other character witnesses who testified were influenced in a degree by the financial or political standing of Mr. Reed. Objections were sustained to a number of these questions, but one or

two witnesses were permitted to answer. It is manifest that this alleged error had no effect on the minds of the jury, since Reed was acquitted, and there is nothing in such questions asked these witnesses or their answers that were permitted to go to the jury that in any way reflected on appellant or that was calculated to prejudice the jury against him.

From our recital of the substance of the evidence it is at once apparent that, under the prevailing rules concerning the weight to be given the verdict of a jury, appellant's contention that the verdict is flagrantly against the weight of the evidence cannot be sustained. According to the evidence of the commonwealth, appellant made an unprovoked and fatal assault upon an unarmed man who was backing away to avoid the difficulty. While it is true that a greater number of witnesses introduced by appellant sustained his theory of the case, it is for the jury to try and determine the facts, and in so doing may believe one witness against a number of witnesses or may accept the evidence of one set of witnesses and refuse that of another set. Bently v. Commonwealth, 242 Ky 332, 46 S. W. (2d) 103; Jones v. Commonwealth, 250 Ky. 217, 62 S. W. (2d) 56; Johnson v. Commonwealth, 244 Ky. 608, 51 S. W. (2d) 932; Conn v. Commonwealth, 245 Ky. 583, 53 S. W. (2d) 931.

With respect to the plea of insanity, it may be said that the evidence of the Ohio physicians is somewhat convincing; however, appellant appeared before the jury as a witness and made intelligent and lucid answers to all questions asked him on both direct and cross examinations. He made none of the bombastic statements and evidenced none of the abnormalities testified to by physicians for the defense, but, on the other hand, the whole tenor of his evidence was to show justification for his act and to present his defense in the most favorable light. This was likewise a question to be determined by the jury, and in the proven facts and circumstances it cannot be said that the verdict is palpably or flagrantly against the evidence.

Coming to the final ground argued for reversal, it may be said without setting out in detail the instructions given or the particular points of attack against them that on the whole they fairly and properly presented the issues to the jury. While the instruction

submitting the issue of insanity may be longer than necessary and possibly inaptly drawn, it is as favorable to appellant as the one which his counsel contends should have been given, and presents the issues in such a way as to be easily understood by a jury of intelligent men.

Finding no error in the record prejudicial to appellant's substantial rights, the judgment is affirmed.