(Decided Feb. 7, 1936.)

## Allen v. Commonwealth (two cases).

C. E. TYREE for appellants.

B. M. VINCENT, Attorney General, and GUY H. HERDMAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

The two appellants, brothers, were jointly indicted on a charge of unlawfully, maliciously, and forcibly assaulting another with a deadly weapon, with the felonious intent to rob such person; it being descriptively charged that within the twelve months before the indictment, accused had attacked one Thomas Pigg, assaulting him with a deadly weapon (a pistol), and had attempted robbery.

A motion for separate trials was sustained, and the commonwealth elected to try John Allen first. He was placed on trial on March 1, and Sam's trial followed the next day, March 2, 1935. Though tried by

different juries, each was found guilty, and the same penalty, twenty years in the state reformatory, was inflicted. Motions for new trials were overruled; judgments entered in accord with the verdicts. Appellants present their appeals to this court in separate transcripts. Appellants have moved this court to hear their appeals together, submitting for our consideration a brief in the John Allen case, which is asked to be treated as a brief in the companion case. This motion has heretofore been sustained. The contention presented in each case is that the verdict of the jury is flagrantly against the evidence, and its consideration necessarily requires a review of the evidence.

The prosecution rested upon the testimony of one witness, Thomas Pigg, who was assaulted. The substance of his testimony is that at the time of the assault he was sixty-two years of age, and lived at Heidelberg in Lee county. As near as he could or would fix the time, the assault occurred about 6:30 o'clock, "a little after dark" on January 7, 1935. The depot at Heidelberg seems to be the central point for fixing directions and distances, as does the passing of a train due at 7:30 measure time to a considerable extent.

Thomas Pigg lived a little less than a quarter of a mile from the depot, and the two accused lived about fifty yards from his home, he living on the "creek" and they on a "branch." Pigg, in his testimony, said: "They lived just above me a little." He said he knew the two boys and had known them ever since they were small boys and had seen them "pretty much all the time."

In going from the depot to the home of witness, a path turns off from the main road, and at some point in the path where there was some timber growth there is a stump, which witness says is about fifty yards from his home.

On the night of the assault and just before dark, witness had gone to the depot to talk to some friend who had been loading coal. After he had seen and talked to the friend he started homeward, and he relates the occurrence of assault as follows:

"I was going along to my home and I was going around, and these two gentlemen were hid behind the stump; John Allen and Sam, and John punched

me right there (indicating cheek) with a pistol. Yes, sir, and he said 'stick them up' and I didn't stick them up, and so the next pass he dug me and fired his pistol, and I knocked the pistol off, and they both closed me; they both came on to me, clenched me, and John hit me over the head with the pistol and knocked me down, and they grabbed their hand over my mouth and was choking me, and cut this right ear in two, and Dr. Evans sewed it up.''

He then relates that after they had knocked him down and choked him, they went through his pockets. He says it was John who did this while Sam was smothering and choking him; that they found no monery, and after searching him, ''they run, went off down the hill around back.'' The witness got up, went to his home and shortly an officer came and took him to Beattyville for aid. It is noted that on cross-examination, upon being pressed on the question of identification, he said (in the Sam Allen case): ''I do know it was these two gentlemen, sir; if I had not known it I would not have said so.''

On cross-examination witness said that he did not see either of the accused around the depot; that the assault occurred before the ''night train'' came down in the direction of Lexington, and that at the time of the assault it was ''light, the moon was shining and it was not raining.''

To show motive of assault, it was said by the witness that he had some time previous thereto killed, dressed, and sold a beef for which he got $27, and that the Allen boys knew of this because ''when they come up there to get a mess of beef'' he told them of the sale to a butcher in the village. He further said that the boys knew he always ''kept a little money on hand.''

John Allen, testifying in his own behalf, said that he did not see Mr. Pigg at any time on the night of January 7; that he was home at dark; he was there both before and after the 7:30 train went through Heidelberg. He says that Sam was not at home, but he came in shortly after the train ran. He denied knowing anything of the beef transaction, except he says that he and one of his brothers got some government beef from Mr. Pigg. Sam, the brother, says that he

and John were not out together at any time on the night in question; that when he left home John was there and he (Sam) left home between 5 and 6 o'clock. He would not undertake to fix a definite time. When Sam left home his brother Charley left with him, and he says that they hung around the depot until the "train ran." Sam says John was not around the depot at any time during the night.

Rhoda Allen Land, the mother of the two boys, says that John did not leave the home at any time the night of the 7th, "before dark, after dark or at any time." Sam and Charley did leave about dark, saying they were going to the depot. Thomas Land, step-father of the boys, testifies to the same effect, as do Della and Raymond Allen, brother and sister of the two accused.

Five witnesses, not related, testify that they were around the depot from 5 to 5:30 or 6 o'clock to train time while they saw Sam and his brother Charley, and some of them saw another brother, Oakland, none of them at any time saw John. In Sam's case the witnesses who saw Sam and Charley around and in the depot were the same, and testified to the same effect; and the family testified as they did in John's case, that is, that John was at home all the time and Sam and Charley left home about dark and got home shortly after the train ran.

Three witnesses, who say they did not see John, but did see Sam and Charley around the depot at times ranging from 5:30 or 6 o'clock until the "train ran" appear to be slightly confused as to whether or not Sam disappeared from around the depot at some time between the time he appeared and the time the train passed, some saying that if he was missing at any time he was out of sight for only a few minutes. Charley, the brother, was one who seemed confused on this point.

Testimony was introduced tending to show that the night of January 7 was a very dark night and that the moon was not shining at or near the time when Mr. Pigg was assaulted, and the preponderance of proof seems to bear out the fact that the night was dark. However, when he was called back he said that it was not full moon, but that the moon was in its first quarter.

Sam testifies that he got up to Howell's store about 5:30 or 6 o'clock, stood around a while and went to the depot and remained until the "train run," about 7:28, and then went home. He says he went into the depot several times. Charley Allen says they went to the depot about 5 o'clock and in other respects he bears out Sam's testimony. Tandy Allen was around the depot, and says he did not see Sam or Charley, but he heard a gun fire in the direction of Pigg's home about twenty or thirty minutes before the "train ran." Ped Wilson saw Sam and one of his brothers at the post office, a short distance from the depot between 6:30 and 7 o'clock, and when he left he went toward the depot. Jerry Gibbs went to the depot at 6:30 and saw Sam and Charley "up till the train ran." Taulbe Estes says he saw Sam, first at Howell's store and went with him to the depot, and saw him around there until five minutes before the train passed, and other witnesses saw Sam around the depot, one says "until fifteen minutes before train time," and another saw him "up to a little before train time." Several witnesses testified as to the general bad reputation of the two appellants, and no combatting testimony was offered.

There is nothing in the record which established definitely the time of the assault or the time Sam and Charley left home; the time they got to the depot, or the time Sam disappeared, or was out of sight of his companions, or left the depot. It seems the "running of the train" acted as a timepiece for all the witnesses, and thus the time, in so far as it enters into the discussion, is somewhat confused.

Therefore, we have a situation where the prosecuting witness, though standing alone, unqualifiedly and unequivocally insists that the two appellants assaulted him, and emphasizes that insistence under a rather rigid cross-examination. His testimony, of course, was amply sufficient to take the case to the jury. The witnesses for appellants, if their testimony is to be believed, made a defense by way of alibi.

If the controversial question here is to be decided by consideration of numbers, then both appellants have the decided advantage; there would be but one answer. However, it has never been the rule in weighing evidence to marshal forces, hence in this case we must be

guided by the jury's view of the testimony as expressed in their solemn verdict.

One of the cardinal rules of procedure in criminal cases is that if there is slight evidence of guilt, the court must submit the case to the jury. Stegall v. Com., 237 Ky. 694, 36 S. W. (2d) 338; Newsome v. Com., 240 Ky. 333, 42 S. W. (2d) 306. When thus submitted, it becomes the duty of the jury to consider and weigh the testimony, and in doing this they are the sole judges of the credibility of the witnesses. Brummett v. Com., 235 Ky. 322, 31 S. W. (2d) 391; Mills v. Com., 240 Ky. 359, 42 S. W. (2d) 505. Where there is a conflicting state of evidence, it is for the jury to determine which set of witnesses is telling the truth. Buttree v. Com., 242 Ky. 623, 47 S. W. (2d) 73. In Webb v. Com., 257 Ky. 547, 78 S. W. (2d) 770, 773, we said:

"While it is true that a greater number of witnesses introduced by appellant sustained his theory of the case, it is for the jury to try and determine the facts, and in so doing may believe one witness against a number of witnesses or may accept the evidence of one set of witnesses and refuse that of another."

Bently v. Com., 242 Ky. 322, 46 S. W. (2d) 103; Conn v. Com., 245 Ky. 583, 53 S. W. (2d) 931.

From the foregoing recitals of evidence in substance, and applying the long-prevailing rules, we are unable to say that the jury failed in its duty in weighing and considering the evidence, and thus reached an erroneous conclusion, or that the verdict is flagrantly against the evidence. Therefore we must let the judgment stand in each case.

Judgment affirmed.