[Crim. No. 1685.   Third Appellate District.—December 6, 1939.]

THE PEOPLE, Respondent, v. IRL R. BLACKWOOD et al., Appellants.

William J. Cassettari and George E. Foote for Appellants.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

DEIRUP, J., *pro tem.*—Irl R. Blackwood and Irene Blackwood, defendants and appellants, are husband and wife. Each was charged under two counts of an information with the murder of James Roots and Arthur Lavalley. On the first count Irl Blackwood was found guilty of murder in the first degree with recommendation of life imprisonment, and on the same count his wife was found guilty of murder in the second degree. As to the second count both were found guilty of murder in the second degree. They had entered pleas of not guilty and also not guilty by reason of insanity but the latter pleas were withdrawn after a partial trial following the trial upon the pleas of not guilty. The trial court denied a new trial but modified both of the judgments against Irene Blackwood by reducing them to manslaughter.

The homicides were committed on January 1, 1939, at about 4 o'clock in the afternoon. James Roots had lived with his wife and children for some months in a tent house or cabin in a grove of trees near the city of Grass Valley. On this New Year's Day there was a party at the cabin. About seventeen persons were there, including men, women and children, some in the cabin, others outside. Lavalley was one of the guests. Shortly before the killing he and a guest named Maule went to a privy which was about 50 feet from the cabin. Finding it locked, Lavalley pulled off the lock and stepped inside.

The Blackwoods lived in a trailer house approximately 100 feet from the Roots cabin and 150 feet from the privy, which Blackwood had built. A trail from their home to the privy passed close to the Roots cabin. The two families had had trouble over the use of the privy. The Blackwoods ob-

jected to the use of it by strangers; hence the lock. At one time the Roots boys had fastened a chain to the privy and had rattled it while Mrs. Blackwood was inside and this had enraged her. On the day of the homicides, at about noon, a woman who was visiting at the Roots cabin had annoyed her again by putting her foot against the privy, as if to push it over. These are sordid details, of course, but it is necessary to set them out in order to appreciate the states of mind of the appellants.

Immediately after Lavalley pulled the lock off the privy door the Blackwoods came down from their cabin, half walking, half running, Blackwood with a small pistol in his hand, Mrs. Blackwood drawing one from the pocket of her sweater. Blackwood shouted at the two men to "get the hell out of there" and demanded of Lavalley why he had pulled off the lock. Lavalley and Maule, with their hands in the air, tried to explain that they did not know that it was a private toilet. A crowd of guests gathered and tried to appease the Blackwoods, who waved them back with their pistols.

James Roots was in his cabin when the trouble began. One of the children came in and told him about it and he and his wife and her sister stepped outside. Seeing the Blackwoods with guns in their hands Roots went back into the cabin and returned with a long-barreled revolver, remarking that he did not intend to use it but was going to bluff the Blackwoods. They retreated about 20 feet as he walked toward them. Then Blackwood suggested that they all throw down their guns and settle the matter peaceably. Roots immediately threw his pistol 20 or 25 feet away and put up his hands. According to some of the witnesses, Blackwood smiled and fired a shot which flared the hair of Lavalley's daughter, a little girl. She screamed, and Lavalley put his arm around her to reassure her. Mrs. Roots picked up her husband's pistol but was immediately disarmed by one of the guests, who testified that while he was holding her arm the pistol went off. At about the same moment Blackwood shot Roots twice in the chest and Lavalley three times in the abdomen. Lavalley grappled with him and other persons disarmed him. Roots was killed instantly; Lavalley died in a short while.

There was testimony to the effect that Mrs. Blackwood's pistol was jerking as if she was pulling the trigger, but she did not fire any shots. Immediately after the shooting began one of the women seized her by the hair and pulled her down and others disarmed her.

The Blackwoods returned to their cabin after the affray and when an officer arrived to arrest them they gave themselves up after a brief delay. The officer made a memorandum of what occurred at the time. Testifying from his notes, he said that Blackwood resented being handcuffed and remarked "that he was at one time paid for killing men, and now he was arrested for it". He is a veteran of the world war.

Many witnesses were called on behalf of the state and their testimony, though varying in details, bears out the foregoing account of what happened. The stories told by the defendants are entirely different. They admitted that Blackwood fired the shots, but claimed that he did so in self-defense. The jury believed the state's witnesses.

■ Counsel for appellants claim that the evidence shows that the killing was done "upon a sudden quarrel or heat of passion" and that this court should therefore reduce the judgments against Blackwood to manslaughter. (Pen. Code, secs. 192, 1181, subd. 6.) However, there is ample evidence from which the jury could have inferred that Blackwood harbored an intent to kill when he first approached Lavalley and Maule, for he came down from his house in a violent rage, with a gun in his hand, and he commenced shooting immediately after he had disarmed Roots by his suggestion of a truce. The remark he made to the officer about having been paid to kill men also indicated a disregard for human life. But even if the intent to kill was formed after Roots threw away his revolver, the facts nevertheless indicate that it was murder, not manslaughter, that was committed. Roots had accepted an offer of peace; Blackwood was no longer in danger. As has been said very often, "The act of killing may follow the intent to kill as rapidly as follow the successive thoughts of the mind." (*People* v. *French,* 12 Cal. (2d) 720, 745 [87 Pac. (2d) 1014].) Usually the intent to kill precedes the act by an appreciable period of time, but we have in the present case an illustration of the rule. Blackwood knew that he was in no danger,

but in his terrible rage he formed the intent to kill and immediately acted upon that intent, even conceding that he did not harbor the intent when he left his cabin. The judgment should not be modified as to him.

With respect to the defendant Irene Blackwood, counsel urge that the judgment should be reversed upon the ground that she was not guilty of any crime. He claims that there was no evidence of a conspiracy between her and her husband. This is not, however, a case of conspiracy, but of aiding and abetting. "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (Pen. Code, sec. 31.) There was sufficient evidence before the jury to justify it in believing that when the defendants left their trailer house Mrs. Blackwood either knew that her husband intended to commit a homicide, or that such might well be the reasonable and natural consequences of his acts. She did not try to deter him; on the contrary, she aided and encouraged him by drawing a gun from her pocket. She was in a violent rage, too. It is more than likely that he would not have fired the fatal shots at all but for the assurance that he derived from the fact that she was ready to defend him with a gun. The jury was warranted in finding that, with guilty knowledge, she encouraged him in the commission of the crime. She was therefore equally guilty as a principal. (*People* v. *Bond,* 13 Cal. App. 175 [109 Pac. 150]; *People* v. *Marty,* 59 Cal. App. 503 [210 Pac. 964]; *People* v. *Bowers,* 56 Cal. App. 80 [204 Pac. 548].)

Counsel for appellants argue that the effect of the reduction of the judgments against Mrs. Blackwood by the trial court from murder in the second degree to manslaughter is to acquit her. Their contention is that if she is not guilty of murder in the second degree, as being equally guilty with her husband as an aider and abettor, she cannot be held for manslaughter, since she did not commit a homicide herself and that is not the crime for which judgment was entered against her husband.

Our attention has not been called to any case in which the principal in the first degree (as the one who actually commits the act is often called) and the principal in the sec-

ond degree (being the aider and abettor) have been found guilty of different degrees of crime where they have been tried jointly. It is settled that if they have separate trials the judgment against one has no bearing upon the judgment against the other, for the reason that the evidence in the two cases may not be the same. The principal in the second degree may be convicted even though the one who committed the act has been acquitted in another trial. (*People* v. *Bearss,* 10 Cal. 68; *People* v. *Newberry,* 20 Cal. 439; *Christie* v. *Commonwealth,* 193 Ky. 799 [237 S. W. 660, 24 A. L. R. 599, and note].)

We do not believe that the rule that the two principals are equally guilty is so inflexible that a jury might not find them guilty of different degrees of crime even though they are tried jointly. For the evidence against them is not necessarily precisely the same. The firing of the shots by Blackwood warranted an inference of the malice which is essential to the crime of murder, while Mrs. Blackwood might not be chargeable with guilty knowledge of that malice, but might nevertheless be guilty of aiding and abetting him in the commission of voluntary manslaughter ''upon a sudden quarrel or heat of passion''. (Pen. Code, sec. 192.) For this reason a jury might be justified, in such a case as this, in finding the two principals guilty of different degrees of crime, and the trial court might properly, as in this case, reduce one of the judgments and not the other. But in any view of the case the judgments cannot be reversed. If the trial court committed an error, the mistake was in favor of Mrs. Blackwood, and does not furnish grounds for a reversal upon her appeal.

The effect of the order of the trial court reducing the judgment against Mrs. Blackwood to manslaughter was to put the record in the condition that it would have been in if the jury had found her guilty of manslaughter in the first place and the court had entered judgment accordingly. It is clear from the authorities that if the jury had rendered such a verdict Mrs. Blackwood would not be heard to complain, even though the verdict was for a degree of crime less than the one of which she was guilty. These authorities are to the effect that where the evidence shows the defendant to be guilty of murder but the jury is instructed as to manslaughter and brings in a verdict of guilty of manslaughter,

the judgment will stand.   (*People* v. *Hamilton,* 49 Cal. App. 30 [192 Pac. 467] ; *People* v. *Borrego,* 7 Cal. App. 613 [95 Pac. 381] ; *People* v. *Tugwell,* 32 Cal. App. 520 [163 Pac. 508] ; *People* v. *Wolcott,* 137 Cal. App. 355 [30 Pac. (2d) 601].)   In the last case cited it is said:

"The jury in possession of all of the testimony found that the death was caused by appellant.  If the testimony in the circumstances of this case supports that implied finding it would support the finding of murder . . . If the suggestion of manslaughter gave the jury the idea that possibly there were some mitigating circumstances in the killing, and in their private deliberations they concluded that appellant did the killing but that they would acquit him of murder and convict him of manslaughter, a crime included within the crime of murder (*People* v. *Muhlner,* 115 Cal. 303, 304 [47 Pac. 128]), appellant has been the beneficiary of such suggestion.   Without it, it may be assumed that the jury would have convicted him of murder.   (*People* v. *Tugwell, supra.*) This being true, he cannot be heard to object."

The logic of these authorities is applicable to the situation now before this court.   Mrs. Blackwood cannot be heard to complain because the judge of the trial court entered judgments against her that were milder than the ones which would have been imposed if he had accepted the verdicts of the jury.

The judgments and the orders are affirmed.

Thompson, Acting P. J., and Tuttle, J., concurred.