93 Cal.Rptr.2d 827 (2000)
79 Cal.App.4th 67
The PEOPLE, Plaintiff and Respondent,
v.
Ejaan Dupree McCOY et al., Defendants and Appellants.
No. C024654.
Court of Appeal, Third District.
March 17, 2000.
Review Granted July 12, 2000.
*830 David McNeil Morse, Under Appointment by the Court of Appeal, San Francisco, for Defendant and Appellant Derrick Lakey.
Mark D. Greenberg, Under Appointment by the Court of Appeal, Oakland, for Defendant and Appellant Ejaan Dupree McCoy.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Senior Assistant Attorney General, J. Robert Jibson and Stan Cross, Supervising Deputy Attorneys General, Brian G. Smiley, Deputy Attorney General, for Respondent.
Certified for Partial Publication.[*]

OPINION ON REHEARING
SIMS, Acting P.J.
Defendants Ejaan Dupree McCoy and Derrick Lakey were tried in the same trial upon the same evidence and were found guilty of murder and attempted murder. McCoy was the actual perpetrator and Lakey was convicted upon the theory that he aided and abetted McCoy.
We conclude McCoy's convictions must be reversed because the trial court gave an erroneous instruction on imperfect self defense. We further conclude that Lakey's convictions must be reversed because, inter alia, under California law an aider and abettor cannot be convicted of a greater offense than that of which the actual perpetrator is convicted, where both of them are tried in the same trial and upon the same evidence.
In an information filed January 22, 1996, defendants McCoy and Lakey were charged in count 1 with the murder of Calvin Willis (Pen.Code, § 187),[1] in count 2 with the attempted murder of Tubiya McCormick (§§ 664/187), in count 3 with the attempted murder of Tashambe Willis, and in count 4 with the attempted murder of Simon McCormick. Count 5 charged McCoy with being a felon in possession of a firearm (§ 12021, subd. (a)) and count 6 charged the same crime for Lakey. For counts 1 through 4 it was further alleged that defendants were armed with (§ 12022, subd. (a)(1)) and personally used (§ 12022.5, subd. (a)) firearms, they inflicted injury or death by discharging the firearms from a motor vehicle (§ 12022.55), and the offenses were serious and violent felonies (§§ 1192.7, subd. (c)(8), 667.5, subd. (c)(8)). In addition, the information specially alleged that defendants personally inflicted great bodily injury during commission of count 2.
On April 30, 1996, a jury was impaneled to try the case.
On June 21, 1996, the trial court granted the People's motion to dismiss from counts 3 and 4 allegations that defendants inflicted injury by discharging firearms from a motor vehicle within the meaning of section 12022.55.
*831 On July 12, 1996, the jury reached a verdict. Defendant McCoy was found guilty of counts 1, 2, 4 and 5. Defendant Lakey was found guilty of counts 1, 2, 4 and 6. On count 3, the jury found defendants guilty of the lesser-included offense of assault with a semi-automatic firearm (§ 245, subd. (b)). All the special allegations against defendant McCoy were found true. All but three of the special allegations against defendant Lakey were found true; to wit, the jury did not find that Lakey discharged a firearm from a motor vehicle as alleged in counts 1 and 2, or that he personally inflicted great bodily injury as alleged in count 2.
On September 3, 1996, McCoy was sentenced to a determinate term of 25 years and 4 months, plus a consecutively sentenced indeterminate term of 25 years to life. Thus, McCoy's aggregate term was 50 years and 4 months to life.
On September 3, 1996, Lakey was sentenced to a determinate term of 21 years and 4 months, plus a consecutively sentenced indeterminate term of 25 years to life. Thus, Lakey's aggregate term was 46 years and 4 months to life.
McCoy and Lakey[2] appeal.
Defendants contend that: (1) expert testimony that the shootings were an incident of gang retaliation was improperly admitted; (2) the prosecutor committed prejudicial misconduct during the examination of witnesses and when he referred during trial to the killing of Calvin Willis as "murder"; and (3) the trial court committed error instructing the jury on imperfect self-defense and reasonable doubt.
In an unpublished portion of this opinion, we reject defendants first two contentions and also their claim that the trial court gave a defective instruction on reasonable doubt. In the published portion of the opinion, we shall discuss the erroneous imperfect self defense instruction and its effect on Lakey.

FACTS
The victim, Calvin Willis, was standing on the sidewalk near the intersection of Flint Avenue and Georgia Street in the Conway Homes area of Stockton in the evening of September 4, 1995; with him were his sister Tashambe Willis and his cousins Tubiya McCormick and Simon McCormick. Tubiya McCormick held a can of beer in one hand.
Soon after the four met and began talking, a dark car drove up. Defendant McCoy was driving the car and defendant Lakey was in the front passenger seat. Some witnesses testified that Matthew McGee and Patrick Hall were in the back seat.
When he saw the car drive up, Simon McCormick became nervous, and moved behind a tree. As McCoy leaned out of the window and shouted "What's up now nigger," a flurry of shots were fired from the car toward the group. Witnesses saw McCoy and Lakey shooting handguns.
Tubiya McCormick was shot in the chest, but survived. At trial, Tubiya McCormick testified that he turned toward the car after he heard someone say "What's up nigger," and was immediately shot. Calvin Willis was fatally shot in the back of the head as he tried to run away. Tashambe Willis and Simon McCormick were not shot.
During the melee, one or more persons outside McCoy's car began returning fire, and bullet casings were found afterward near the tree where Calvin Willis and his family had been standing. Defendant Lakey was shot and survived. Police questioning Lakey at the hospital found him evasive about the circumstances of his injury, *832 although he eventually stated he had been shot while walking alone in a different part of Stockton.
Defendants McCoy and Lakey, together with Matthew McGee, were charged in the shooting and tried together.
The prosecution's theory of the case was that the Willis shooting was an intended retaliation in an ongoing feud between two Stockton gangs referred to as the "Southside Mob" (also referred to as "Southside Gangsters," "South Mob" or "Southside") and the "Conway Homes Gangsters" or "Conway." In the prosecution's view, the victims were not gang members, but innocent bystanders.
Stockton Police Officer Michael Townes testified as a gang expert and opined that the Willis shooting was a gang-related retaliation attempt, and explained that his opinion was based upon the location of the shooting, the parties involved, and the existence of a recent ongoing feud between Southside Mob and Conway Homes. The intersection of Flint and Georgia, where Willis was killed, is claimed by Conway and is a central location for gang activity. Officer Townes testified that McCoy, Lakey, McGee, and Patrick Hall are South Mob Gangsters; other witnesses also testified that McCoy and Lakey are members of the Southside Mob.
To show that the Willis shooting was precipitated by a string of recent gang shootings, the prosecution offered evidence of several other events. On August 30, less than a week before the Willis shooting, near the intersection of Flint and Georgia, someone from a passing car fired shots at Cheri Mitchell and Calvin Mitchell;[3] Alton Burton was with them. Calvin Mitchell and Alton Burton are "high profile" Conway gang members. The next night, Hammam Noel, who is not a gang member, was shot from a passing car when he was in the company of Calvin Mitchell in the vicinity of Flint and Georgia. The car from which the shots were fired at Hammam Noel crashed and its occupants fled on foot; the car was registered to Patrick Hall and contained Hall's fingerprints and those of defendant McGee. Officer Townes testified he had investigated the shooting of Jonathan Martin, a member of the South Mob, which occurred early on September 4, the same day Willis was killed. Alton Burton pleaded guilty to his involvement in the Martin shooting.
Finally, McCoy's cousin, Latroy Taylor, testified that shortly before Willis was shot, he and McCoy drove past the intersection of Flint and Georgia in McCoy's car. Someone fired a handgun toward the car, which made McCoy angry and upset.
A cellmate of Lakey's after his arrest testified that Lakey admitted participating in a drive-by shooting in which he had shot someone in the head for revenge.
The bullets recovered from Calvin Willis's body were .380 caliber and all were fired from the same gun. McCoy was the only one firing .380-caliber ammunition from the car. DNA factors consistent with those in Lakey's blood were found on the front passenger seat and floor of McCoy's car; the chances of all such factors existing in the same person in the African-American population is one in 720,000. The blood in McCoy's car could not have been his own.
Of the defendants at trial, only McCoy testified. He admitted shooting Calvin Willis, but denied that he had done so as retaliation against Conway Homes gang members; rather, he testified he had fired his gun because he believed he was himself going to be shot.
McCoy testified he had ceased to be a member of the Southside Mob after 1993, was not a gang member at the time of the Willis shooting, and was unaware of the recent shootings involving Hammam Noel and Jonathan Martin.
In the afternoon of the Willis shooting, McCoy drove his cousin Taylor to a *833 friend's house in Conway; on the way he passed the corner of Flint and Georgia, where he saw a group of people standing. After they passed the intersection, McCoy noticed gunshots had been fired in his direction from the group. When he returned home, he decided to return to Conway, seek out his friend Calvin Mitchell, whom he knew to have influence in the Conway neighborhood, and ask him to find out who had been shooting at McCoy and to use his influence to stop it. McCoy brought along his gun for protection, picked up Lakey and drove to Conway. He knew Lakey also had a gun. McCoy testified that neither defendant McGee nor Patrick Hall were with them.
Across the street from Calvin Mitchell's house, McCoy saw three men standing near a tree, and because he thought one man with his back to the car might be Mitchell, he drove slowly toward the group, stopped the car and called out "What's up nigger" to get their attention. He denied that the statement was a challenge or a threat. When he saw one of the three dart behind the tree, McCoy testified he got nervous. When the person McCoy thought was Mitchell turned around, McCoy saw that it was not Mitchell and that the man had a "dark something" in his left hand which appeared to be a gun. McCoy, believing that "[defendant] was going to shoot [him]," grabbed his own gun from the seat next to him and fired. Although McCoy did not know for certain whether the object in the man's hand was a gun before he began firing, when he saw a flash of shots coming toward him from the man's direction, McCoy continued to fire his gun from the car until the gun was empty. Lakey also fired his gun out the window of McCoy's car.
When Lakey cried out that he had been shot, McCoy drove Lakey to the hospital. That night, McCoy learned from his mother that Calvin Willis was one of the men shot.
McCoy admitted he lied to the police about whether he and Lakey were present when Calvin Willis was shot, lied when he denied shooting Willis, and lied when he denied that Lakey was shot.

DISCUSSION

I

Imperfect Self-Defense Instruction
We consider first McCoy's challenge to the instruction jury members received on the defense theory of "imperfect" self-defense.
Imperfect self-defense (also called unreasonable self-defense) applies when the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable. (People v. Humphrey (1996) 13 Cal.4th 1073, 1082, 56 Cal. Rptr.2d 142, 921 P.2d 1; In re Christian S. (1994) 7 Cal.4th 768, 773-774, 783, 30 Cal. Rptr.2d 33, 872 P.2d 574; People v. Flannel (1979) 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1; People v. Curtis (1994) 30 Cal.App.4th 1337,1354, 37 Cal.Rptr.2d 304; People v. Arts (1989) 215 Cal.App.3d 1178, 1186, 264 Cal.Rptr. 167, disapproved on other grounds in People v. Humphrey, supra, 13 Cal.4th at p. 1089, 56 Cal.Rptr.2d 142, 921 P.2d 1.) Imperfect self-defense is not a complete defense to homicide. However, it negates malice aforethought and thereby reduces a homicide which would otherwise be murder to voluntary manslaughter. (People v. Humphrey, supra, 13 Cal.4th at p. 1082, 56 Cal.Rptr.2d 142, 921 P.2d 1; People v. Flannel, supra, 25 Cal.3d at p. 674, 160 Cal.Rptr. 84, 603 P.2d 1.)
When, as here, there is evidence from which a jury could reasonably conclude that the defendant killed the victim in the actual but unreasonable belief he had to act to defend himself against imminent peril, the jury should be instructed *834 properly on the theory of imperfect self-defense. (See People v. Barton (1995) 12 Cal.4th 186, 200-201, 47 Cal.Rptr.2d 569, 906 P.2d 531 [where "substantial evidence" relevant to imperfect self-defense exists, the court must so instruct sua sponte]; cf. People v. Flannel, supra, 25 Cal.3d at pp. 684-685, 160 Cal.Rptr. 84, 603 P.2d 1 [if evidence supporting a manslaughter theory is "minimal and insubstantial," trial court need not instruct on that theory], limited on unrelated grounds by subsequent statute as described in In re Christian S., supra, 7 Cal.4th at pp. 777-778, 30 Cal.Rptr.2d 33, 872 P.2d 574.) By his testimony, McCoy provided evidence that he started shooting because he thought the dark object in Tubiya McCormick's hand was a gun and believed he (McCoy) was in imminent danger: "I thought he was going to shoot me. It appeared to be a gun in the hand. I thought he was going to shoot me." Although McCoy admitted he began shooting before he was certain whether the object in Tubiya McCormick's hand was, in fact, a gun, Tubiya McCormick's own testimony confirmed that his hand contained something metallic, a beer can, when he turned toward McCoy's car. Under the evidence presented, the jury could have accepted McCoy's testimony that he shot Willis in actual fear for McCoy's own safety, and yet, following the court's erroneous instruction on imminent peril, rejected the defense by concluding that a reasonable person in McCoy's position would not have thought it necessary to defend before he could more clearly ascertain whether Tubiya McCormick was in fact holding a gun. Given the evidence, McCoy was entitled to a legally accurate instruction on imperfect self defense.
The CALJIC instruction on imperfect self-defense is No. 5.17 (6th ed.1996 bound vol.) (hereafter CALJIC No. 5.17). It states: "A person, who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. [¶] Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter. [¶] As used in this instruction, an `imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. [¶] [However, this principle is not available, and malice aforethought is not negated if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstance which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]"
Although the imperfect self-defense instruction given the jury in this case generally tracks the language of CALJIC No. 5.17, the court's oral delivery of the instruction departed from the recommended text, as relevant to this appeal, by the addition of the phrase which we italicize: "Now, a person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief. [¶] However, such an actual but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter. It is a partial justification for the crime of murder only. [¶] An imminent peril or danger is one that is apparent, present, immediate and must be instantly dealt with or must so appear at the time to the slayer as a reasonable of [sic] person. [¶] However, this principle] is not available, and malice aforethought is not negated if the defendant by his unlawful or wrongful conduct created the circumstance which legally justified his adversary's use of force." (Italics added.)
*835 The corresponding written instruction which the jury was provided states in pertinent part: "An `imminent' peril [or] [danger] is one that is apparent, present, immediate and must be instantly dealt with or must so appear at the time to the slayer as a reasonable person."[4] (Italics added.)
McCoy attacks the definition of imminent peril contained in the imperfect selfdefense instruction used in this case. He argues that, by adding the requirement that the peril against which the defendant has acted must appear imminent to the slayer "as a reasonable person," the instruction improperly injected an objective standard into what is a subjective test. Because the first paragraph of the instruction clearly sets forth a subjective standard, McCoy argues, the addition of "as a reasonable person" into the second paragraph rendered the instruction "hopelessly confused" and "useless," to defendant's prejudice.
"In deciding whether an instruction is erroneous, we ascertain at the threshold what the relevant law provides. We next determine what meaning the charge conveys in this regard. Here the question is, how would a reasonable juror understand the instruction. [Citation.] In addressing this question, we consider the specific language under challenge and, if necessary the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly." (People v. Warren (1988) 45 Cal.3d 471, 487, 247 Cal.Rptr. 172, 754 P.2d 218.)
The Supreme Court articulated the doctrine of imperfect self-defense in People v. Flannel, supra, 25 Cal.3d 668, 160 Cal. Rptr. 84, 603 P.2d 1, concluding that "[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (Id. at p. 674, 160 Cal.Rptr. 84, 603 P.2d 1, italics omitted.) As it relates to murder, a specific intent crime requiring proof of malice aforethought, the Flannel court held "[n]o matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard. Where the awareness of society's disapproval begins, an honest belief ends. It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (Id. at p. 679, 160 Cal.Rptr. 84, 603 P.2d 1; see also In re Christian S., supra, 7 Cal.4th at p. 773, 30 Cal.Rptr.2d 33, 872 P.2d 574 [preferring the "more precise term 'actual belief" (original italics) over Flannel's "honest belief'].)
Thus, in order to warrant a conviction of manslaughter rather than murder under the doctrine of imperfect-self defense, the defendant must actually believe both that danger is imminent and that lethal force is necessary to prevent death or great bodily injury, even though that actual belief is unreasonable. (People v. Flannel, supra, 25 Cal.3d at p. 679, 160 Cal.Rptr. 84, 603 P.2d 1; accord, People v. Uriarte (1990) 223 Cal.App.3d 192, 197, 272 Cal.Rptr. 693.) Although the requirement that danger be "imminent" contains the concept of immediacy, "the belief [that *836 the peril faced presents an immediate danger] need not be reasonable for imperfect self defense...." (People v. Arts, supra, 215 Cal.App.3d at pp. 1187-1188, 264 Cal. Rptr. 167, original italics.) A proper imperfect self-defense instruction, then, should advise the jury to consider the defendant's belief in the imminence of the danger faced, not the belief of a reasonable person.
The imperfect self-defense instruction with which the jury was charged in this case instead expressly instructed the jury to consider whether the danger appeared to be immediate to the defendant "as a reasonable person." This instruction would be understood by a reasonable juror to require an assessment of whether a reasonable person in McCoy's position would consider that the danger posed by Tubiya McCormick was imminent; this is an objective test. The injection of an objective test into the instruction contradicts the first portion of the instruction, which directs the jury to consider whether McCoy acted pursuant to an "actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury ... even though a reasonable person in the same situation, seeing and knowing the same facts[,] would not have had the same belief." As delivered, the instruction informed the jury that for McCoy to negate the malice required for a murder conviction so that he could be convicted instead of manslaughter, it must find that he suffered from an unreasonable belief in the necessity to defend himself from an imminent peril, but only if the peril would appear imminent to a reasonable person.
We must agree with McCoy that to require that the danger appear to be imminent to the defendant "as a reasonable person" directly contradicts the principle of imperfect, or unreasonable, self-defense, which requires only that the defendant have acted in actual fear of imminent harm, not in fear of imminent harm which would appear to be such to a reasonable person. Although other instructions repeated that the crime of manslaughter requires only that a defendant has acted in the "[honest] but unreasonable belief in the necessity to defend oneself against imminent peril," (see, e.g., CALJIC Nos. 8.40 and 8.50 (6th ed.1996 bound vol.)) no other instruction correctly directs the jury to consider the question of imminence from the defendant's subjective point of view.
The appropriate standard of review for this error is the Chapman "harmless beyond a reasonable doubt" test. (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711; see People v. Avila (1995) 35 Cal.App.4th 642, 651-659, 43 Cal.Rptr.2d 853.) Applying the Chapman test, and based on the evidence set forth above, we cannot say the error committed by misstating the law of imperfect self-defense was harmless beyond a reasonable doubt. McCoy's convictions for the murder of Calvin Willis and the attempted murders of Tubiya and Simon McCormick must be reversed.
We reject the Attorney General's contention that any error in the instruction is necessarily harmless because "McCoy's wrongful conduct made imperfect self-defense inapplicable to this case," because McCoy "wrongful[ly]" shouted the challenge of "What's up now, nigger" at the group. This argument relies on the last paragraph of CALJIC No. 5.17, which provides that imperfect self-defense is not available "if the defendant by his unlawful or wrongful conduct created the circumstance which legally justified his adversary's use of force, attack or pursuit." The Attorney General's argument ignores the final clause of this paragraph, which requires that, to deprive a defendant of the defense of imperfect self-defense, the defendant's actions must "create[] the circumstance which legally justified his adversary's use of force, attack or pursuit." (CALJIC No. 5.17.) A shouted challenge by McCoy would not create circumstances which would have "legally justified" (italics *837 added) an attack by Tubiya McCormick or anyone else.
We likewise reject defendants' challenge to the final paragraph of CALJIC No. 5.17. They contend its failure to define "any unlawful or wrongful act by the defendant" improperly permitted the jury to decide that "a reckless or wrongful act" operates to deprive defendants of the partial justification of imperfect self defense, including McCoy's admitted possession of a firearm, his "act of driving to an encounter in which there was a chance of gunplay," or his "addressing a group of loiterers in this neighborhood from a car with the salutation of `What's up, nigger?'" No definition of "unlawful or wrongful act" was necessary here. Jurors are presumed to follow the court's instructions (People v. McLain (1988) 46 Cal.3d 97, 119-120, 249 Cal.Rptr. 630, 757 P.2d 569), and as we have explained, other language contained in CALJIC No. 5.17 informs the jury that only a defendant's unlawful or wrongful act which provides legal justification for the victim's "use of force, attack or pursuit" may deprive the defendant of the benefit of the right to assert he acted in imperfect self-defense. No reasonable jury would have concluded that defendants' unlawful possession of firearms or their "driving to an encounter in which there was a chance of gunplay" so provided legal justification for such action by the victims as to deprive defendants of the benefit of CALJIC No. 5.17.
We conclude McCoy's convictions for murder and attempted murder must be reversed.

II

Lakey's Convictions on Counts 1 and 2 and 4 For Murder and Attempted Murder Must be Reversed
In a supplemental brief filed in connection with our rehearing of this matter, defendant Lakey contends his convictions for murder and attempted murder must also be reversed because McCoy's convictions for those offenses are reversed. The People disagree, contending Lakey's convictions should be affirmed. For reasons we shall explain, we agree with Lakey.
At the outset, we should point out that it is likely that Lakey was convicted in counts 1, 2 and 4 as an aider and abettor, not the actual perpetrator.
With respect to count 1, the evidence showed that all the bullets in Calvin Willis's body came from McCoy's gun. Moreover, the jury found "not true" the special allegation that Lakey inflicted injury or death by discharging a firearm from a motor vehicle.
With respect to count 2, the jury found "not true" the special allegation that Lakey inflicted injury or death by discharging a firearm from a motor vehicle and also the special allegation that Lakey had personally inflicted great bodily injury on the victim.
These circumstances strongly suggest that Lakey was convicted not as the actual perpetrator but rather as an aider and abettor on counts 1 and 2.
Count 4 is more problematic, because the special allegations (of discharging a firearm from a vehicle and infliction of great bodily injury) were not at issue in that count. However, having found that Lakey was not the actual perpetrator in counts 1 and 2, it is unlikely that the jury would find he was the actual perpetrator in count 4, since, for the most part, the evidence showed simply that Lakey had fired his gun out the window of the car without specifying that Lakey had any particular target. The only significant exception to this evidence was the testimony of Lakey's cellmate, who said that Lakey admitted he had shot someone in the head for revenge. But the only victim shot in the head was Calvin Willis. The victim in count 4, Simon McCormick, was not shot at all. It appears from the jury's findings in count 1 that the jury discredited the cellmate's testimony. We therefore conclude it was *838 probable that the jury found Lakey guilty as an aider and abettor on count 4 as well as on counts 1 and 2.
We conclude Lakey's convictions on counts 1, 2 and 4 cannot stand for two independent reasons: (1) under California law, a defendant who is tried as an aider and abettor cannot be convicted of an offense greater than that of which the actual perpetrator is convicted, where the aider and abettor and the perpetrator are tried in the same trial upon the same evidence, and (2) on this record, we cannot conclude with reasonable certainty that any participant acted with malice in connection with counts 1, 2 and 4, so we cannot say that the crimes of murder or attempted murder have been committed. We address these matters serially.

A. As a general matter under California law, an aider and abettor cannot be held responsible for a crime greater than that committed by the actual perpetrator where they are tried in the same trial upon the same evidence.

The California Supreme Court has said, "The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense." (People v. Croy (1985) 41 Cal.3d 1, 12, fn. 5, 221 Cal.Rptr. 592, 710 P.2d 392, followed in People v. Padilla (1995) 11 Cal.4th 891, 920, 47 Cal.Rptr.2d 426, 906 P.2d 388 and People v. Nguyen (1993) 21 Cal.App.4th 518, 530, 26 Cal. Rptr.2d 323 [opinion of this court].) "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense. [Citation.]" (People v. Francisco (1994) 22 Cal. App.4th 1180, 1190, 27 Cal.Rptr.2d 695.)
It follows inexorably from these principles that in California, "It is ... recognized that an aider or abettor cannot be guilty of a greater offense than the principal offender. [Citations.]" (People v. Williams (1977) 75 Cal.App.3d 731, 737, 142 Cal. Rptr. 704; see People v. Antick (1975) 15 Cal.3d 79, 89, 123 Cal.Rptr. 475, 539 P.2d 43; People v. Petruzo (1910) 13 Cal.App. 569, 577, 110 P. 324; People v. Sidelinger (1908) 9 Cal.App. 298, 299, 99 P. 390.)
People v. Sidelinger, supra, is directly on point. There, defendant Sidelinger was convicted as an aider and abettor of a murder actually committed by Hayes. The trial court refused to give a voluntary manslaughter instruction apparently reasoning that under no view of the evidence could the jury find the defendant guilty of manslaughter. The Court of Appeal, in the companion case of People v. Hayes (1908) 9 Cal.App. 301, 99 P. 386, found it was error for the trial court to refuse the manslaughter instruction. In Sidelinger the Court of Appeal found the failure to give the manslaughter instruction was prejudicial as to Sidelinger stating, "If, in fact, Hayes actually killed Jenks, and in so doing only committed the crime of manslaughter, his aiders and abettors were only guilty of manslaughter. [Citations.]" (People v. Sidelinger, supra, 9 Cal.App. at p. 299, 99 P. 390.)
Sidelinger is directly on point and we shall follow it.
It is true that two California cases have held that an aider and abettor may be convicted of a lesser crime than the actual perpetrator. The first of these is People v. Blackwood (1939) 35 Cal.App.2d 728, 96 P.2d 982. There this court reasoned that an aider and abettor could be convicted of a lesser crime than the actual perpetrator because "the evidence against them is not *839 necessarily precisely the same. The firing of the shots by Blackwood warranted an inference of the malice which is essential to the crime of murder, while Mrs. Blackwood might not be chargeable with guilty knowledge of that malice, but might nevertheless be guilty of aiding and abetting him in the commission of voluntary manslaughter 'upon a sudden quarrel or heat of passion.'" (Id. at p. 733, 96 P.2d 982.)
Blackwood is of course distinguishable on the obvious ground that it stands for the proposition that an aider and abettor may be held guilty of a lesser offense than the actual perpetrator. Moreover, Blackwood is further distinguishable from this case because here the evidence against Lakey and McCoy was the same. In any event, as we shall explain below, Blackwood's essential reasoning is faulty since, in order to be convicted of murder, an aider and abettor need not harbor malice provided that the actual perpetrator harbors malice.[5]
The other case holding that an aider and abettor may be convicted of a lesser crime than the perpetrator is People v. Woods (1992) 8 Cal.App.4th 1570, 11 Cal.Rptr.2d 231, also from this court. There, however, the jury was apparently instructed (unlike in this case) that the aider and abettor could be held liable not only for the crime that the aider and abettor actually aided but also for any crime which is a reasonably foreseeable consequence of the criminal act originally contemplated by the perpetrator and the aider and abettor. We reasoned that the aider and abettor could be held liable for a lesser offense than the perpetrator on the theory that the aider and abettor might have foreseen a lesser offense than that committed by the perpetrator and consequently his liability would be diminished. (Id. at p. 1587, 11 Cal.Rptr.2d 231.) That reasoning is wholly inapplicable to the question of whether an aider and abettor may be convicted of a greater offense than the perpetrator.
We also note that previous decisions have held an accomplice may be convicted of murder where the actual perpetrator is convicted of manslaughter (People v. Newberry (1862) 20 Cal. 439, 441) or is acquitted altogether (see People v. Bearss (1858) 10 Cal. 68, 70; People v. Wilkins (1994) 26 Cal.App.4th 1089, 1093-1095, 31 Cal. Rptr.2d 764), but these have involved separate trials of the offenders. A prior acquittal or manslaughter conviction of the perpetrator is not inconsistent with a later murder conviction of the accomplice because the evidence presented in the separate proceedings may have been different. In other words, despite acquittal in the first proceeding, a subsequent jury may logically conclude a murder was committed and the accomplice willingly participated. Furthermore, as explained by the federal high court, differing results in separate trials "does no more than manifest the simple, if discomforting, reality that `different juries may reach different results.... That is one of the consequences we accept under our jury system.' [Citation.] While symmetry of results may be intellectually satisfying, it is not required." (Standefer v. United States (1980) 447 U.S. 10, 25, 100 S.Ct. 1999, 2009, 64 L.Ed.2d 689, 699-700.)
These authorities are inapposite here, where McCoy and Lakey were tried in the same trial upon the same evidence.
To sum up, the liability of an aider and abettor is vicarious or derivative. It depends entirely upon the crime committed by the actual perpetrator. Where the perpetrator and the aider and abettor are tried in the same trial upon the same evidence, it is nonsensical under California law to convict an aider and abettor of a crime greater than the perpetrator and *840 California authorities so hold. We follow them.[6]

B. Lakey's convictions for murder and attempted murder cannot be affirmed because, as the jury was actually instructed in this case, no participant may be said to have acted with malice.

There is a second, independent reason why Lakey's convictions on counts 1, 2 and 4 cannot stand.
Section 187, subdivision (a) provides, "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."
Malice is an essential element of murder. (People v. Hansen (1994) 9 Cal.4th 300, 307-308, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) "[A] killing cannot become murder in the absence of malice aforethought." (People v. Mattison (1971) 4 Cal.3d 177, 182, 93 Cal.Rptr. 185, 481 P.2d 193, followed in People v. Dillon (1983) 34 Cal.3d 441, 465, fn. 11, 194 Cal.Rptr. 390, 668 P.2d 697.) Moreover, the crime of attempted murder requires express malice. (People v. Carpenter (1997) 15 Cal.4th 312, 391, 63 Cal.Rptr.2d 1, 935 P.2d 708.) The jury was so instructed in this case.
As the jury was actually instructed in this case, we cannot say with confidence that either defendant acted with malice. Hence, we cannot say with confidence that the crimes of murder or attempted murder were committed.
We have already seen that defendant McCoy received an improper instruction on imperfect self-defense. A correct instruction could have entitled the jury to conclude that McCoy did not act with malice. Consequently, we cannot say with confidence on this record that McCoy acted with malice.
Nor, upon the instructions actually given, was the jury required to determine that defendant Lakey acted with malice.
Thus, the jury was instructed on aiding and abetting as follows:
"Now, the persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:
"One, those who directly and actively commit or attempt to commit the act constituting the crime;
"Or, two, those who aid and abet the commission or attempted commission of the crime.
"A person aids and abets the commission or attempted commission of the crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator and, two, with the intent or purpose of committing, encouraging or facilitating the commission of the crime by act or advice aids, promotes, encourages or instigates the commission of the crime.
"Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.
"Mere knowledge this is a crime is being committed [sic] and the failure to prevent it does not amount to aiding and abetting."
This instruction merely required the jury to determine that Lakey had "knowledge of the unlawful purpose of the perpetrator" *841 and the intent of "committing, encouraging or facilitating the commission of the crime." It did not require the jury to find that Lakey acted with malice.
Nor did other instructions. For example, the jury was instructed that the jury had to find a certain specific intent or mental state in the mind of the perpetrator (but not in the mind of an aider and abettor) as follows:
"In the crimes and allegations charged in Counts 1, 2, 3 and 4 or which are lesser crimes described thereof, namely, murder, voluntary manslaughter and attempted murder or manslaughter there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed.
"I've already given you those specific intent [sic]. This specific intent required has been included in the definition of the crimes or allegations which I just read to you.
"In the crimes charged in Counts 1, 2, 3 and 4, namely murder and attempted murder there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless such mental state exists, the crime to which it relates is not committed.
"And again the mental states required are included in the definitions of the crimes which I have must read." (Italics added.)
In short, as the jury was actually instructed, the jury was not required to find that defendant Lakey, as an aider and abettor, harbored malice.
We note that the jury was instructed on these principles in accordance with California law. As will appear, there is no requirement under California law that an aider and abettor of a murder must harbor malice. Thus, "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not this specific intent that is an element of the target offense, which ... must be found by the jury. [Citation.]" (People v. Croy, supra, 41 Cal.3d at p. 12, fn. 5, 221 Cal.Rptr. 592, 710 P.2d 392, followed in People v. Mendoza (1998) 18 Cal.4th 1114, 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.) It follows that a defendant who aids and abets a murder need not act with malice; it is sufficient that an aider and abettor "encourage and bring about conduct that is criminal." (People v. Olguin (1994) 31 Cal.App.4th 1355, 1379, 37 Cal. Rptr.2d 596; see People v. Padilla, supra, 11 Cal.4th at p. 920, 47 Cal.Rptr.2d 426, 906 P.2d 388.)
Since, on this record, we cannot say the jury properly found that either McCoy or Lakey acted with malice aforethought, we cannot say that the crimes of murder or attempted murder have been committed, and Lakey's convictions must be reversed along with McCoy's.

III-V[**]

VI

Prosecutor's Option to Retry Defendants
As discussed, McCoy has shown that, had the jury been instructed properly, it might have reduced his culpability to a finding of guilty of voluntary manslaughter on count 1, and guilty of attempted voluntary manslaughter on counts 2 and 4. The same goes for Lakey. "When a greater offense must be reversed, but a lesser included offense could be affirmed, we give *842 the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense." (People v. Kelly (1992) 1 Cal.4th 495, 528, 3 Cal.Rptr.2d 677, 822 P.2d 385; People v. Edwards (1985) 39 Cal.3d 107, 118, 216 Cal.Rptr. 397, 702 P.2d 555; see People v. Woods, supra, 8 Cal.App.4th at pp. 1595-1596, 11 Cal.Rptr.2d 231.)
Here, the People are privileged to try to obtain another conviction of murder and attempted murder, and the record clearly contains sufficient evidence to justify the attempt. On the other hand, the prosecution may decide that it is satisfied with voluntary manslaughter and attempted voluntary manslaughtera decision which we neither suggest nor discourage.
Our disposition preserves that option. If, after the filing of the remittitur in the trial court, the People do not bring McCoy or Lakey to retrial on the murder and attempted murder counts that we reverse within the time limit set forth in section 1382, subdivision (a)(2)60 days unless waived by the defendantor, if the People elect, in a writing filed in the trial court, not to retry defendants, or either of them, the trial court shall proceed as if the remitter constituted a modification of the judgment to reflect the following convictions, and shall resentence defendants (or either of them) accordingly: on count 1 (murder of Calvin Willis), voluntary manslaughter; on count 2 (attempted murder of Tubiya McCormick), attempted voluntary manslaughter; and on count 4, (attempted murder of Simon McCormick), attempted voluntary manslaughter. (§§ 1260, 1382; see People v. Jones (1997) 58 Cal. App.4th 693, 720, 68 Cal.Rptr.2d 506.)

DISPOSITION
The convictions of defendants Ejaan McCoy and Derrick Lakey on counts 1, 2, and 4 are reversed unless the People accept a reduction of the convictions as follows: on count 1, voluntary manslaughter; on count 2, attempted voluntary manslaughter; and on count 4, attempted voluntary manslaughter.
If, after the filing of the remittitur in the trial court, the People do not bring McCoy or Lakey to retrial on the reversed murder and attempted murder charges within the time limit set forth in section 1382, subdivision (a)(2)60 days unless waived by the defendantor if the People elect, in a writing filed in the trial court, not to retry defendants, or either of them, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect the foregoing convictions of McCoy or Lakey for voluntary manslaughter and attempted voluntary manslaughter and shall promptly resentence them, or either of them, accordingly.
As to defendant McCoy, the trial court is ordered to amend the abstract of judgment to include the section 12022.7 enhancement and to forward a corrected copy to the Department of Corrections.
In all other respects, the judgment as to each defendant is affirmed.
RAYE, J., concurs.
HULL, J., Concurring and Dissenting.
I concur in the opinion and judgment of the majority except for part II, as to which I dissent. Neither law nor logic requires that an aider and abettor be afforded the benefit of a mitigating factor applicable only to the actual perpetrator to reduce a homicide from murder to manslaughter. Hence, because there is no evidence in the record that Lakey himself was laboring under an honest but unreasonable belief in the need for self-defense, he was not harmed by the erroneous imperfect selfdefense instruction.
In concluding Lakey's conviction must be reversed, the majority rely on general legal principles that aider and abettor liability is derivative in nature and "an aider or abettor cannot be guilty of a greater offense than the principal offender." (People v. Williams (1977) 75 Cal.App.3d 731, 737, 142 Cal.Rptr. 704.) These principles *843 are correct as far as they go. However, the majority's seductively one-dimensional approach to this matter merely begs the question of what "offense" the actual perpetrator has committed. As I shall explain, homicide has traditionally been treated as a single offense for purposes of accomplice liability, with the degree of guilt of the individual actors dependent on their respective states of mind. Consequently, a conviction of an aider and abettor for murder in the same proceeding where the actual perpetrator is convicted of manslaughter does not offend the principle that an aider and abettor cannot be guilty of a greater offense than the actual perpetrator.
The idea that accomplice liability is derivative in nature means simply that "an accomplice is not guilty of an independent offense of `aiding and abetting'; instead, he derives his liability from the primary party with whom he has associated himself. The primary party's acts become his acts." (Dressier, Understanding Criminal Law (2d ed.1995) § 30.02[A][2], p. 428, fns. omitted.) As with criminal responsibility in general, accomplice liability involves both an actus reus and a mens rea. Regarding the latter, "[a]n aider and abettor ... must `act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" (People v. Mendoza (1998) 18 Cal.4th 1114, 1123, 77 Cal. Rptr.2d 428, 959 P.2d 735, original italics.) "When the offense charged is a specific intent crime, the accomplice must `share the specific intent of the perpetrator'; this occurs when the accomplice `knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.'" (People v. Prettyman (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.)
Under normal circumstances, an accomplice cannot be convicted of an offense where the perpetrator is acquitted in the same proceeding. It logically follows that an accomplice cannot be convicted of an offense in the same proceeding in which the perpetrator is convicted of a lesser included offense. This is because conviction of a lesser included offense implies acquittal of the greater offense. (See People v. Kurtzman (1988) 46 Cal.3d 322, 324-325, 331-334, 250 Cal.Rptr. 244, 758 P.2d 572.)
However, whether based on some analytic distinction or merely an historic aberration, homicide is treated differently. As one commentator noted: "In the English common law there was but one crime of felonious homicide (if petit treason is ignored). The division of this into murder and manslaughter resulted from early statutes intended to exclude the more heinous types of homicide from the benefit of clergy. In its origin this was merely a difference in penalty depending on the presence or absence of aggravating circumstances, and no doubt it would have been worded in terms of `degrees' of the crime if that concept had been in use at the time. For some purposes murder and manslaughter have come to be regarded as distinct offenses, but the common law never entirely lost sight of the notion that the crime is felonious homicide, of which murder and manslaughter are but different grades." (Perkins & Boyce, Criminal Law (3d ed.1982) § 8, p. 731, italics omitted.) As explained by another commentator: "An accomplice may be convicted of first-degree murder, even though the primary party is convicted of second-degree murder or of voluntary manslaughter. This outcome follows, for example, if the secondary party, premeditatedly, soberly and calmly, assists in a homicide, while the primary party kills unpremeditatedly, drunkenly, or in provocation. Likewise, it is possible for a primary party to negligently kill another (and, thus, be guilty of involuntary manslaughter), while the secondary party is guilty of murder, because he encouraged the primary actor's negligent *844 conduct, with the intent that it result in the victim's death." (Dressier, Understanding Criminal Law, supra, § 30.06[C], p. 450.)
In People v. Blackwood (1939) 35 Cal. App.2d 728, 96 P.2d 982, this court concluded that, because of the actors' different states of mind, an accomplice could be convicted of manslaughter despite the fact the actual perpetrator had been convicted of murder. We explained: "We do not believe that the rule that the two principals are equally guilty is so inflexible that a jury might not find them guilty of different degrees of crime even though they are tried jointly. For the evidence against them is not necessarily precisely the same. The firing of the shots by Blackwood warranted an inference of the malice which is essential to the crime of murder, while Mrs. Blackwood might not be chargeable with guilty knowledge of that malice, but might nevertheless be guilty of aiding and abetting him in the commission of voluntary manslaughter `upon a sudden quarrel or heat of passion.'" (Id. at p. 733, 96 P.2d 982.)
Although Blackwood involved a conviction of the accomplice for a lesser offense than the actual perpetrator, decisions from other states have upheld convictions for greater offenses. In State v. McAllister (La. 1978) 366 So.2d 1340, the court concluded an accomplice could be convicted of first degree murder despite the fact the actual perpetrator had been found guilty of manslaughter on the basis of a heat of passion theory. According to the court: "One who aids and abets in the commission of a crime may be charged [with] and convicted [of] a higher or lower degree of crime depending on the mental element proved at trial. [Citation.] The actual perpetrator of the crime may act in hot blood, in which case he would be guilty of manslaughter, while the instigator may act cooly and thus be guilty of murder. [Citation.] ... While `passion' may be a mitigating element for the actual perpetrator and serve as a defense to first degree murder for him, it may not be asserted by a principal who lacks the requisite mitigating element." (Id. at p. 1343.)
In Parker v. Commonwealth (1918) 180 Ky. 102, 201 S.W. 475, the court found no inconsistency in an accomplice being convicted of murder while the actual shooter was convicted only of manslaughter on a heat of passion theory. The facts indicated there was "bad feeling" between the accomplice and the victim before the offense and this induced the accomplice to "precipitat[e] a difficulty" with the victim, thereby providing an opportunity to kill him. (Id. at p. 478.) The court explained it had "several times recognized the principle that where the person who fires the shot which produces the death acts in sudden heat and passion or sudden affray, and is guilty only of manslaughter, the aider and abettor who incites the killing may be guilty of willful murder if he at the time aids, abets, and incites the killing, entertains malice aforethought, and his actions are controlled by such malice." (Ibid.)
In State v. Wilder (1980) 25 Wash.App. 568, 608 P.2d 270, the court upheld a first degree murder conviction of the accomplice despite the perpetrator being convicted of second degree murder. The evidence showed the accomplice aided and abetted the perpetrator with a premeditated intent to kill. (Id. at pp. 573-574, 608 P.2d 270.)
In addition to the historic underpinnings of criminal law in general and accomplice liability in particular, policy considerations support differing treatment of those concerned in the commission of a homicide. Reduction of murder to voluntary manslaughter on the basis of heat of passion or imperfect self-defense is premised on the mental state of the perpetrator, a mental state not necessarily shared by the accomplice. An accomplice who knowingly assists another to commit murder is no less culpable if the other ultimately kills the victim while in a heat of passion or under a mistaken belief in the need for self-defense. (See Dressier, supra, Understanding *845 Criminal Law, § 30.06[B][2][b], pp. 446-447.)
The majority make no attempt to address the policy considerations or historic underpinnings of accomplice liability as described above, choosing instead to rely on prior opinions which are either inapposite or not supported by the authorities cited. For example, in People v. Williams, supra, 75 Cal.App.3d 731, 142 Cal.Rptr. 704, the court stated in dictum an accomplice cannot be convicted of a greater offense than the principal. (Id. at p. 737, 142 Cal.Rptr. 704.) However, that case involved a defendant who initiated a struggle with another and then exhorted her sister to shoot the other. The sister was acquitted altogether, whereas the defendant was convicted of murder. (Id. at pp. 734-736, 142 Cal.Rptr. 704.) The Court of Appeal affirmed, concluding the sister had been acquitted on a theory she acted in defense of the defendant whereas the defendant's guilt was based on the use of her sister as an innocent instrumentality. (Id. at pp. 739, 744-746, 142 Cal.Rptr. 704.) Accomplice liability was not at issue.
In People v. Sidelinger (1908) 9 Cal.App. 298, 99 P. 390, the defendant was an accomplice to a homicide and the trial court refused to give a manslaughter instruction because there was no evidence to support it. (Id. at p. 299, 99 P. 390.) The Court of Appeal reversed on the basis of evidence from which it could be concluded the actual perpetrator was guilty only of manslaughter. (Id. at pp. 299-300, 99 P. 390.) In support of its conclusion the accomplice was entitled to a voluntary manslaughter instruction if the principal actor was so entitled, the court cited several out-of-state decisions, "(... Goff v. Prime, 26 Ind. 196; Polly v. Commonwealth, 15 Ky. Law Rep. 502, [24 S.W. 7]; State v. Dunn, 116 Iowa 219 [89 N.W. 984]; Wheeler v. Commonwealth, 120 Ky. 697, [87 S.W. 1106].)." (Id. at p. 299, 99 P. 390.) However, none of these decisions supports the proposition stated.
In Goff v. Prime, supra, 26 Ind. at p. 198 the court stated in dictum: "One aiding and abetting in the commission of manslaughter may, in our opinion, be convicted under an indictment for aiding and abetting in the commission of murder in the first or second degree." (Id. at p. 198.) In State v. Dunn, supra, 116 Iowa 219, 89 N.W. 984, Dunn was indicted along with Gray for murder in the death of Williams as the victim attempted to flee. (Id. at p. 985.) The court affirmed Dunn's conviction for murder notwithstanding the fact Gray had earlier been convicted of manslaughter. (Id. at pp. 986-987; see State v. Gray (1902) 116 Iowa 231, 89 N.W. 987, 989.) In both Wheeler v. Commonwealth, supra, 120 Ky. 697, 87 S.W. 1106 and Polly v. Commonwealth, supra, 24 S.W. 7 the court indicated an accomplice may be guilty of manslaughter where the actual perpetrator is guilty of manslaughter. However, in neither case did the court say the accomplice may be convicted only of manslaughter.
In sum, homicide has historically been treated as a single offense for purposes of accomplice liability. Although criminal offenses in this state are strictly a matter of statute, it is appropriate to consult the common law to explain the Legislature's intent in enacting a particular provision. (See People v. Woods (1992) 8 Cal.App.4th 1570, 1581, 11 Cal.Rptr.2d 231.) Our analysis of the issue presented in this matter must therefore be informed by the historic treatment of accomplice liability in the context of a homicide. Whether the majority consider this to be anomalous or unfair is beside the point. As Justice Holmes aptly stated over a hundred years ago: "The life of the law has not been logic: it has been experience." (Oliver Wendell Holmes, Jr., The Common Law (1881) p. 1.) I would not give Lakey the benefit of McCoy's imperfect self-defense theory but would hold him responsible on the basis of his own state of mind at the time of the offenses.
The majority conclude there is a second, independent reason why Lakey's convictions *846 cannot stand. According to the majority, because of the erroneous instruction given in this matter, it cannot be determined whether the jury found either McCoy or Lakey acted with malice. The majority reason that the erroneous instruction left malice as to McCoy uncertain and that the accomplice instructions did not require an independent finding of malice as to Lakey. I find this second reason for reversing Lakey's conviction no more convincing than the first.
Because an accomplice need not himself harbor malice, Lakey's guilt turns on whether it can be said the jury found McCoy harbored malice at the time of the offenses. While the majority are correct that, as it relates to McCoy, malice cannot be determined because of the erroneous imperfect self-defense instruction, this does not resolve the issue as to Lakey. This is because malice, properly understood, is merely the intent to kill or the intent to do a dangerous act with conscious disregard of its danger coupled with an absence of some mitigating factor, such as heat of passion or imperfect self-defense. (People v. Breverman (1998) 19 Cal.4th 142, 189, 77 Cal.Rptr.2d 870, 960 P.2d 1094 (dis. opn. of Kennard, J.).) Thus, when the jury found McCoy guilty of murder, it necessarily concluded he either intended to kill the victims or intentionally and knowingly committed a dangerous act with conscious disregard for the consequences.
In my view, this is enough to support Lakey's convictions. Since, as discussed previously, Lakey is not entitled to rely on McCoy's imperfect self-defense to reduce his level of culpability, the erroneous instruction cannot negate the jury's finding of malice in this regard. The record before us is sufficient to establish the requisite mental state to support the conviction of Lakey for murder and attempted murder. I would affirm as to Lakey.
NOTES
[*] Pursuant to rule 976.1 of the California Rules of Court, this opinion, including the concurring and dissenting opinion, is certified for publication with the exception of parts III, IV and V of the DISCUSSION in the majority opinion.
[1] Further section references are to the Penal Code unless otherwise designated.
[2] In a footnote to his responsive brief, the Attorney General contends that Lakey's appeal is premature and must be dismissed, on the ground that Lakey filed his notice of appeal one day before pronouncement of judgment. The Attorney General is incorrect. The record discloses that judgment was pronounced on September 3, 1996. Lakey filed his notice of appeal two days later, on September 5, 1996.
[3] Calvin Mitchell and Calvin Willis are second cousins.
[4] We are not aided in our analysis of this instruction by the state of the record. The clerk's transcript does not disclose who requested this instruction, and because the trial court elected to conduct the instruction conference in chambers and off the record, there is no record of how the jury came to be instructed with this modified version of CALJIC No. 5.17. After what appears to have been the principal (unreported) instruction conference, a short conference was conducted on the record to consider "new" instructions, but it is apparent from the transcript of the latter conference that most of the text of what the parties refer to as 5.17 (and its use of the phrase "as a reasonable person") was determined at the unreported conference.
[5] Blackwood's result is correct upon the view that the case represents an example of inconsistent verdicts about which the defendant has no standing to complain. (See People v. Woods (1992) 8 Cal.App.4th 1570, 1604, 11 Cal.Rptr.2d 231 (dis. opn. of Sparks, J.).)
[6] The dissent acknowledges the principles of aider and abettor law controlling the disposition of this case but asserts "whether based on some analytic distinction or merely an historic aberration, homicide is treated differently." (Cone. & dis. opn. at p. 843.) The premise is incorrecthomicide is not treated differently in California. The single case cited by the dissent suggesting otherwise, People v. Blackwood, supra, 35 Cal.App.2d 728, 96 P.2d 982, speaks of no such difference. Perhaps homicide is treated differently in other states but the dissent provides no principled "analytic distinction" that would warrant a different treatment, and we are not compelled to adopt the decisional aberrations of Kentucky and Louisiana, no matter how firmly embedded they might be in the legal history of those states.
[**] See footnote *, ante.